**Harold KAUFMAN, Appellant,**

v.

**UNITED STATES of America, Appellee.**

**No. 17834.**

United States Court of Appeals Eighth Circuit.

Sept. 8, 1965.

Rehearing Denied Oct. 18, 1965.

Walter E. Diggs, Jr., of Grand, Peper & Martin, St. Louis, Mo., for appellant.

William C. Martin, Asst. U. S. Atty., St. Louis, Mo., Richard D. FitzGibbon, Jr., U. S. Atty., St. Louis, Mo., for appellee.

Before MATTHES and BLACKMUN, Circuit Judges, and REGISTER, District Judge.

BLACKMUN, Circuit Judge.

Harold Kaufman, upon his plea of not guilty, was convicted by a jury of bank robbery in violation of 18 U.S.C. § 2113 (a) and (d). His sole defense was insanity at the time of the crime. His motions for acquittal made at the close of all the evidence and for a new trial were denied by Judge Regan. A sentence of 20 years was imposed. Kaufman appeals in forma pauperis.

Counsel for the defendant was appointed by the trial court. Promptly after the indictment was returned, the defense filed a motion under 18 U.S.C. § 4244 for the determination of Kaufman's mental competency at that time. This motion of course was granted and the defendant was taken to the United States Medical Center at Springfield, Missouri. The ensuing report from that institution indicated competency to stand trial. The court so found. Trial counsel was granted leave to withdraw by the district court after notice of appeal had been filed. The defendant is represented on this appeal by other counsel appointed by this court.

The points raised here by the defense concern (a) the evidence as to Kaufman's sanity at the time of the offense; (b) the admission of certain lay testimony on the sanity issue; and (c) the defendant's Sixth Amendment right to the effective assistance of trial counsel.

There is, therefore, no real dispute as to the robbery or as to Kaufman's commission of the physical acts constituting that crime. The defense concedes this. Government evidence showed the following: About four p. m. on December 16, 1963, Kaufman, then 39, entered the office of the Roosevelt Federal Savings & Loan Association, River Roads Branch, in Jennings, Missouri. He conversed with two employees, pulled a gun, announced a holdup, and demanded and received cash in excess of $300 and travelers checks for $11,520. He then ordered everyone first into the manager's office and then into a storage room and departed. Shortly thereafter he was apprehended in Alton, Illinois, with the cash and checks in his possession.

A. *The defendant's sanity at the time of the offense.* The question of Kaufman's sanity at the time of the crime was appropriately raised and was submitted to the jury under instructions which are not challenged. Thus, when the defense asserts that the court erred in denying its motion for acquittal at the close of all the evidence, its position necessarily is that the evidence was such that reasonable men must agree that there was reasonable doubt as to Kaufman's sanity. Dusky v. United States, 295 F.2d 743, 756 (8 Cir. 1961), cert. denied 368 U.S. 998, 82 S.Ct. 625, 7 L.Ed.2d 536; United States v. Westerhausen, 283 F.2d 844, 852 (7 Cir. 1960).

In Davis v. United States, 160 U.S. 469, 488, 16 S.Ct. 353, 358, 40 L.Ed. 499 (1895), the Supreme Court said:

"If the whole evidence, including that supplied by the presumption of sanity, does not exclude beyond reasonable doubt the hypothesis of insanity, of which some proof is adduced, the accused is entitled to an acquittal of the specific offence charged."

In the Dusky opinion, p. 754 of 295 F.2d, we cited the Davis case, the subsequent opinion in the same prosecution, Davis v. United States, 165 U.S. 373, 378, 17 S.Ct. 360, 41 L.Ed. 750 (1897), and other holdings, and we observed:

"The law consequently indulges in the presumption in favor of a defendant's sanity. That presumption, however, is rebuttable. The defendant's sanity may be brought into issue. Once it is in issue, the prosecution, in the federal courts, at least, must establish sanity beyond a reasonable doubt just as it must prove every other element in its case."

See also Hurt v. United States, 327 F.2d 978, 981 (8 Cir. 1964).

■ Neither side questions these principles. The government, at oral argument, appeared to concede that it possessed the burden of proving Kaufman's sanity although it complains that the court's instructions, by omitting reference to the presumption of sanity, made that burden heavier than it should have been. In any event, we conclude here, as we did in Dusky, p. 755 of 295 F.2d, that on the record before us the evidence was sufficient to place this burden on the government.

This necessitates a review of the evidence. Kaufman did not testify. The defense presented two expert and three lay witnesses:

1. Dr. H. Wayne Glotfelty, whose qualifications were stipulated, was a psychiatrist on the staff of the Federal Medical Center at Springfield since July 1963. He had practiced psychiatry for 18 years. He examined Kaufman while the defendant was at Springfield in 1964 and participated in the staff evaluation of him. This resulted in a diagnosis of "schizophrenic reaction, paranoid type in partial, rather stable remission". Dr. Glotfelty testified that, according to his information, Kaufman's mother died when he was very young; that he probably felt unwanted; that he started becoming truant at about eleven; that he

has had difficulty with the law ever since; that he has had some paranoid thinking; that many schizophrenics "are able to function fairly satisfactorily on the border line in society"; that, being in remission, there was an earlier point in time when the intensity of his disease was more severe than at the time of the examination; that a person who suffers from schizophrenia is affected by the stress of everyday life; that his confinement from December 16 on could have caused the remission; that "It would have been possible" that his condition was severe enough at some point prior to the examination "so he would have had difficulty controlling his actions"; that this, however, "could be better determined by people who observed him in December or November, or in the recent past"; and that he did not know whether Kaufman's condition was so severe "that he would not have known what he was doing in December". On cross-examination the doctor stated that the Springfield staff had concluded that Kaufman was rational and was competent to stand trial; that on the day of the crime "I would say generally he did know right from wrong"; that the witness did not know whether as of that date Kaufman was able to refrain from doing a wrongful act; that if he was not nervous on December 16 and was rational with everyone in contact with him, then "I would think he was exactly like he was when we examined him in January and February, and I would say then that he was, he knew everything that was responsible at that time"; that his ability to stop arguments in the presence of children would tend to show he had control; and that a schizophrenic person, paranoid type, in partial, rather stable remission is able to function almost normally, is one who usually would be discharged from a state hospital, and is "just about normal".

2. Dr. Isadore David Waitzel possessed a Swiss medical degree, was licensed in New York in 1938, and in other states, was board certified, and, among various assignments, had been, for a

time, the psychiatrist director of the State Psychiatric Clinic in Jamestown, North Dakota. At Jamestown he had occasion to examine Kaufman on December 30, 1960. His diagnosis of the defendant at that time was "Psychoneurotic reaction, other (severe)". He testified that Kaufman was not then psychotic; that his tolerance for stress and anxiety was so low that he was capable of deviant behavior; that he did not see Kaufman after 1960; that he was then a schizoid personality; that he was low in self-esteem; and that in his opinion Kaufman in December 1963 could have known right from wrong but had been subjected to such severe anxiety and pressure that he could not restrain himself from the impulse to commit crime. On cross-examination he stated that he had found no schizophrenia in Kaufman in 1960; that "he was performing on an average level of intelligence"; that in 1963 he reacted to internal pressures with criminal behavior which he could not control; that, based upon the testimony he had heard in court and upon his own experience and examination of Kaufman, the defendant "could have found himself unable to refrain from the commission of an act he knew to be unlawful" on December 16, 1963; and that this opinion, however, was partially based upon the truthfulness of the testimony he had heard in court.

3. Patricia Scott is described by the defense as "Kaufman's obvious love object" who spurned him. At the time of the trial she was in a New York state prison serving a sentence for attempted burglary. She had been convicted in England for prostitution. She had never married but had three children, each by a different father. She met the defendant at a friend's apartment in New York City in August 1963 when she was released on bail. She stayed at that apartment for a few days and then shared one with Kaufman for about a week and a half. They then took separate apartments. Throughout this period she saw the defendant constantly except when he was out of town. He paid her rent and contributed substantially to her support.

He asserted responsibility for her and her children. He gave her "quite a few thousand dollars" between August and December. He asked her to marry him. Among their acquaintances was a fence named Jack Keller. Keller gave Kaufman some stolen money orders. The defendant was to cash these and share the returns equally with Keller. Kaufman, however, lost the money orders. Keller demanded his money from the defendant and, when he was not paid, put pressure on Kaufman through threats. The defendant did make some payments to Keller. Kaufman told Scott that when he was out of town he obtained his money by stealing. He complained about her going out with others. They would scream at each other. He talked constantly about the police looking for him. The defendant "always seemed to be nervous" and "really you couldn't talk to him". Kaufman enjoyed her children and took them places and they had a good time with him. On occasion "he started to blow up in front of" them but she would ask him to leave and he would stop. She told the defendant she couldn't stand him. She had no sexual relations with him. She said, as to December 1963, "Well, I don't think he is sane".

4. Joseph Kiernan, a detective with the New York City Police Department for eight years, testified that his office had Keller under surveillance and that he became acquainted with Kaufman because the latter was seen in Keller's company on October 27, 1963, and again four days later when he apprehended Kaufman. The defendant resisted that arrest, asserting that he thought Kiernan and his partner were men out to kill him because he was not making the payments to Keller. He was released on bail and thereafter for five or six weeks had contact with Kiernan and cooperated in the efforts of the police to arrest Keller. During these contacts Kaufman indicated that he was in love with Miss Scott and liked her children. "He struck me as very nervous". He had a tendency to stray in his conversations with the police but he was coherent and when they would

pin him down he would talk about the subject. "I couldn't say an opinion either way. He would be sane to me. He did things that were strange or out of order, but in my opinion, but not insane by any means; no, sir". Kaufman gained nothing from his activities. "I thought that was odd, of course, but, again, I don't think it was insane".

5. The warden of the Saint Louis City jail testified that librium was prescribed for the defendant in March 1964 and since then.

It seems to us, in summary of all this evidence from the defense, that Dr. Glotfelty's testimony amounted to an opinion that Kaufman's mental condition could have been worse on December 16 than when he was at Springfield; that he was hesitant, however, to give any opinion as to this; that it would have been possible for Kaufman then to have had difficulty controlling his actions; and that his capacity at the moment of the crime could best be determined by those who saw him at that time. Dr. Waitzel's evaluation of the defendant was based on his examination of him three years before when he was not psychotic, on his own experience, and on the testimony he heard at the trial. He went on to say that the defendant's tolerance for stress was low, and that at the time of the crime he could have known right from wrong but, in the light of the prior testimony, could not restrain himself from impulse to commit crime. Dr. Waitzel thus is more positive than Dr. Glotfelty but his opinion necessarily rests on his old examination of the defendant and on the truth of testimony which he heard in court. Patricia Scott had a more personal acquaintanceship with the defendant for four months immediately preceding the crime. She expressed her lay person's opinion that he was not sane on December 16. Detective Kiernan also presented some revealing aspects of Kaufman's behavior but his layman's opinion was that he was not insane.

Such is the defense evidence. Taken alone it obviously presents a picture of a somewhat unusual person who was under emotional and even some physical pressure, who engaged in illicit activities, who was devoted in his way to Patricia Scott and her children, and who associated with persons of ill repute in New York City. On the insanity feature the lay testimony was divided. Of the two experts, Dr. Glotfelty's opinion was reserved and qualified, and Dr. Waitzel's was subject to the handicaps of time and of a condition of truthfulness on the part of other witnesses, particularly the convict Patricia Scott. If the jury felt, as it could, that Scott's testimony was not true, the very foundation for Dr. Waitzel's opinion disintegrates. This defense material, therefore, in itself demonstrates that the evidence was not such as to make Kaufman's sanity at the time of the commission of the crime so questionable that, as a matter of law, he was entitled to an acquittal.

But there is other evidence, too. The government in rebuttal presented witnesses whose testimony bore on the issue. We need not discuss that testimony in similar detail. It suffices to summarize:

Dr. Gustave J. Weiland, who completed his internship only in June 1961, who was on the psychiatric staff at Springfield for two years beginning July 1962, and who was not yet board certified, testified that when he examined Kaufman in February 1964 the defendant presented no evidence of hallucinations or delusions and could distinguish right from wrong. Dr. Weiland joined in the staff diagnosis. He stated that he could express no opinion as to whether Kaufman on the preceding December 16 could refrain from doing a wrongful act but he found no medical evidence indicating such an inability. He felt that an ability to cease, on request, an argument in front of children was medical evidence of control and of motivation.

John Davidson, a Saint Louis internist, was summoned by the FBI to see Kaufman on the evening of December 16, after his arrest, and because of his automobile accident that day. He observed the de-

fendant for about an hour. Kaufman appeared to him to be oriented as to time, place, and person. The witness was impressed by "his relative lack of anxiety and calmness under the circumstances". He observed in the defendant no gross manifestation of a psychotic or neurotic nature. George M. Peet, Special Agent with the FBI, testified that he saw Kaufman at the Alton police station; that at that time he was "slightly nervous"; that his conversation was logical and coherent; that he was in Kaufman's presence for about four hours that evening; that he observed nothing unusual about his actions; and that he was responsive and asked intelligent questions and appeared to be sane. He also saw Kaufman on December 17, 18, and 20 and January 24 and 27, and on these occasions he was responsive, logical, coherent, not overly nervous, and evidenced no change in the way he asked and answered questions. Agent Peet spent, in all, over ten hours with Kaufman in those two months. Franklin J. Walls, another agent, testified that he saw Kaufman on the evening of December 16 for about four hours; that his answers to questions were logical, coherent, responsive, and detailed; that he appeared to be "slightly nervous" at Alton but not very nervous on arrival at the FBI office in Saint Louis; that he did not observe anything about him which was unusual; and that he appeared sane. John Obertz, Chief of Police at Jennings, testified as did Walls except that, on objection, he was not permitted to express an opinion as to whether Kaufman appeared to be sane or insane.

Witnesses presented by the government in its case-in-chief had also testified that the defendant appeared normal and not nervous or agitated and that he was calm and logical. These witnesses were the manager of the Alton store where the defendant purchased a gun on December 16, the manager of the Association's branch, the assistant manager there, and a customer who entered the office while Kaufman was present.

The defense would downgrade Dr. Weiland's testimony on the grounds that he was not yet board certified, was junior to Dr. Glotfelty, and was only a "fledgling psychiatrist" (using a term which we employed, perhaps not very appropriately, in the Dusky opinion, p. 755 of 295 F. 2d) who saw Kaufman only once for about twenty minutes, and that this witness conceded it was possible for Kaufman not to have been able to control his actions at some time prior to his stay at Springfield. The defense would characterize Dr. Weiland as an unqualified expert and would dismiss the testimony of the non-experts as not being directed to the crucial issue of control and as not that of witnesses qualified to give an opinion as to sanity.

In Dusky v. United States, supra, pp. 747–756 of 295 F.2d, we discussed at length the impact and merits of expert opinion and lay testimony on the issue of a defendant's sanity at the time of a crime. There a young medical witness was called by the defense and testified, from an examination he made of Dusky at Springfield, that that defendant probably could not tell right from wrong. Lay witnesses testified as to his nervousness before and after the crime and one of them presented evidence as to the defendant's awareness of his predicament and his act. We said, p. 754:

> "This and other courts have said that expert opinion as to insanity rises no higher than the reasons upon which it is based, that it is not binding upon the trier of the facts, and that lay testimony can be sufficient to satisfy the prosecution's burden even though there is expert testimony to the contrary,"

and we held in that case that the submission of the insanity issue to the jury was proper.

The present case, we feel, is controlled by Dusky for we regard the prosecution's evidence here just as strong as that in Dusky. Here there is expert testimony. Here, except for Patricia Scott, there is lay testimony consistently supporting Kaufman's normal actions, coherence, orientation, general absence of apparent

nervousness, and a natural concern for children. Here, also, as in Dusky, there was factual, as distinguished from opinion, evidence which lends support to the government's position: the planning of the crime; the inspection of a savings and loan office other than the one held up; the purchase of the gun; the conversation with the managers relative to his recent arrival in town, a savings account and the possibility of a loan; the careful herding of everyone into the manager's office and then into a storage room; his concern for the children present; Patricia Scott's willingness to leave her children in Kaufman's custody; and the like.

Here again, as in Dusky, the defense presses upon us the case of United States v. Westerhausen, supra, 283 F.2d 844 (7 Cir. 1960), and also refers to McKenzie v. United States, 266 F.2d 524 (10 Cir. 1959), and Fielding v. United States, 102 U.S.App.D.C. 167, 251 F.2d 878 (1957), decided by a divided court. We discussed all three cases in Dusky, pp. 757–758 of 295 F.2d, and regarded them as clearly distinguishable on their facts. We felt that the evidence in those and other cases "seems so overwhelming in favor of the defense position that we regard as almost inevitable the courts' conclusions that the insanity issue there was not submissible". We observed, p. 757,

> "There is nothing essentially sacred or untouchable in expert testimony. The mere fact that the primary evidence on one side may be typified as expert in character while that on the other is exclusively from the mouths of lay witnesses and from lay facts must not of itself serve to destroy the jury's traditional function."

See Feguer v. United States, 302 F.2d 214, 242 (8 Cir. 1962), cert. denied 371 U.S. 872, 83 S.Ct. 123, 9 L.Ed.2d 110, and Barkley v. United States, 116 U.S.App.D.C. 334, 323 F.2d 804, 806–807 (1963).

■ We therefore conclude that, on the record evidence, Judge Regan's denial of the defense motion for an acquittal was not improper.

B. *Lay testimony as to Kaufman's sanity*. This question springs from the first and, indeed, is part of it. We treat it separately because the parties have done so.

Specifically, the defense asserts that the trial court committed prejudicial error in permitting agents Peet and Walls to testify, over objection, that in their opinion Kaufman was sane on December 16, 1963. It is argued that these men were only arresting officers who had not known Kaufman before; that they were asked for more than their mere observations as to his behavior; and that they were not qualified to speak on the issue of sanity. It is further stated that the comments of those witnesses who testified during the government's case-in-chief were irrelevant and valueless as to sanity because their testimony came in before sanity was in issue.

■ There is something to be said for this approach. Our comments in Dusky clearly indicate the propriety and admissibility of qualified lay testimony as to sanity. The lay witness, however, must be qualified by having had at least some assuring opportunity of observation of the defendant. Turner v. American Sec. & Trust Co., 213 U.S. 257, 260, 29 S.Ct. 420, 53 L.Ed. 788 (1909).

In McKenzie v. United States, supra, 266 F.2d 524 (10 Cir. 1959), the court observed that two cafe and bar workers and arresting officers were neither acquainted with the defendant nor aware of his previous conduct and were not capable of expressing an opinion as to his mental condition. It went on to say, pp. 526–527:

> "Before a non-expert witness is competent to testify to the sanity or insanity of another person, he must show an acquaintance of such intimacy and duration as to clearly indicate that his testimony will be of value in determining the issue. The conclusion must be based upon the

witness's testimony as to specific instances of behavior or conduct."

See Carter v. United States, 102 U.S. App.D.C. 227, 252 F.2d 608, 618 (1957), and Hopkins v. United States, 107 U.S. App.D.C. 126, 275 F.2d 155, 157 (1959). The McKenzie court, however, p. 527 of 266 F.2d, clearly acknowledged the appropriateness of qualified lay testimony. The District of Columbia Circuit does, too. Barkley v. United States, supra, p. 806 of 323 F.2d.

██ In our view the testimony of Agents Peet and Walls was admissible and is not disqualified. Agent Peet, as the defense concedes, was with Kaufman for no less than a total of ten hours in the months of December and January. Walls was with him on December 16 for almost four hours. They were, therefore not casual arresting officers or witnesses who saw him for a moment and went on their way. That they may not have known him for a period of months goes, on this record, only to the weight and not to the admissibility of their testimony. Furthermore, the defense witness, Dr. Glotfelty, on both direct and cross-examination, in expressing his reticence about testifying as to Kaufman's mental capacity on the day of the crime, said that "that could be better determined by people who observed him in December". The defense's own witness, therefore, channeled the inquiry to the date of the crime and to persons who observed the defendant at that time. Still further, the defense, in its presentation and direct examination of Detective Kiernan, sought to emphasize, through this lay witness, activities on Kaufman's part "other than normal", and made inquiry of the detective as to whether the defendant was sane or insane. The answer happened to be adverse. Lay examination was thus provided as an example by the defense itself through a witness whose status was similar to that of Peet and Walls.

Under these circumstances and with all these factors present here, we hold that the admission of the opinion testimony of these two lay witnesses was not error.

### C. The claimed denial of the effective assistance of counsel.

1. The trial court appointed counsel for Kaufman on December 20, 1963. Their appearance was entered December 27. The indictment against the defendant was returned January 15, 1964. As has been indicated above, Agent Peet interviewed Kaufman on December 20 and on January 24 and 27 after the appointment of counsel. Kaufman's lawyer was not present.

The defense argument is that Peet's testimony as to these interviews and as to Kaufman's then demeanor was violative of the principles laid down in Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), and Spano v. People of State of New York, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959) and recognized by this court in Vinyard v. United States, 335 F.2d 176 (8 Cir. 1964), cert. denied 379 U.S. 930, 85 S.Ct. 327, 13 L.Ed.2d 342.

██ Here, again, as in Vinyard, we feel that "Massiah may not be so construed". We there said, p. 184 of 335 F.2d:

"Its ruling is limited to holding, as constitutionally improper, the receipt into evidence of statements surreptitiously elicited from a defendant after indictment and in the absence of his counsel, such statements intended to be used in prosecution of the offense for which he had been indicted."

Agent Peet's testimony as to these conversations with Kaufman did not relate to their contents, or what Kaufman said, as pertinent evidence "to be used in prosecution of the offense". (The record shows, on the contrary, that the trial court was careful to exclude any reference to those contents). Furthermore, the physical facts of the offense had already been proved by the government's case-in-chief and were never contested by the defense. The Peet testimony was presented by the government only by way of rebuttal to the insanity defense which by then Kaufman had projected into the case. It was restricted

to the facts that Peet had had the conferences with the defendant and as to his demeanor. It served as qualifying material for Peet's opinion evidence as to insanity. This is far different from a defendant's own incriminating statement such as were introduced in evidence in Massiah and in Spano. We liken the situation to that of observed physical characteristics of a defendant rather than with elicited discriminatory statements. See Holt v. United States, 218 U.S. 245, 252–253, 31 S.Ct. 2, 54 L.Ed. 1021 (1910).

■ 2. The defense also suggests that letters written by the defendant to his counsel were subjected to jail censorship and that this, too, was a denial of the effective assistance of counsel guaranteed by the Sixth Amendment. It cites Coplon v. United States, 89 U.S.App.D.C. 103, 191 F.2d 749, 757 (1951), cert. denied 342 U.S. 926, 72 S.Ct. 363, 96 L.Ed. 690.

We search this record in vain for anything bearing on this point and find only, in the district court file, a handwritten "Motion for Writ of Habeas Corpus" in which the defendant personally made the assertion. No claim, however, is made that any jail censorship hampered or denied the defendant's right to private consultation with his counsel. At allocution, he said:

"The only thing I can say is I never had better representation in my life. These people have been up to see me maybe forty, fifty times in the County Jail, and I feel I have had courtesy from Your Honor."

The point obviously has no substance. Furthermore, this court recently passed precisely upon it, decided it adversely to the defense position, and demonstrated the inapplicability of the Coplon case. Haas v. United States, 344 F.2d 56, 64–67 (8 Cir. 1965).

We appreciate the fine work performed, in connection with this appeal, by Walter E. Diggs, Jr., of the Saint Louis Bar, as court-appointed counsel for the defendant.

Affirmed.