**Harold KAUFMAN, Petitioner,**

v.

**UNITED STATES of America, Respondent.**

**No. 66 C 218(3).**

United States District Court
E. D. Missouri, E. D.

March 16, 1967.

Albert H. Hamel, Clayton, Mo., for petitioner.

Richard D. FitzGibbon, Jr., U. S. Atty., St. Louis, Mo., for respondent.

## MEMORANDUM OPINION AND ORDER

REGAN, District Judge.

Petitioner, presently serving a sentence of 20 years imposed by this Court for armed robbery of a federally insured savings and loan association, seeks relief under § 2255, Title 28 U.S.C. A plenary hearing has been held on his original and supplemental motions to vacate the sentence and judgment, and the matter is now before the Court.

Kaufman's sole defense at his trial was insanity when the offense was committed. This issue was submitted to the jury under appropriate instructions. See Kaufman v. United States, 8 Cir., 350 F.2d 408, for a résumé of the trial evidence bearing on the issue of insanity.

The major issue on the instant motions is whether petitioner was incapable of cooperating fully with his counsel in preparing for trial and in the trial itself by reason of his alleged physical and emotional illness and his taking of drugs prior to, during and subsequent to the trial. Based on this alleged inability to cooperate, petitioner now claims he was thereby deprived of the effective assistance of counsel.

The Court appointed counsel to assist petitioner on his § 2255 motion, and ordered that he be returned to St. Louis from the penitentiary at Atlanta to enable him to consult with his appointed counsel. Ample time thereafter was afforded petitioner and his counsel to prepare for the hearing. Subpoenas were issued at the government's expense for the production of all records and documents requested by petitioner [1] and for certain witnesses.

---

1. Subsequent to the submission of this case, Kaufman informed the Warden of the penitentiary that the records which had been forwarded to the Court in response to the subpoena did not include records of the Federal Detention Head-

On motion of petitioner, the Court appointed Doctor Paul T. Hartman, an expert in the field of psychiatry and neurology, for the purpose of evaluating the medical records and documents bearing upon the issue. Dr. Hartman had also examined petitioner prior to his trial, pursuant to an order obtained by petitioner, but petitioner did not permit him to testify at the trial.

Petitioner was apprehended in December, 1963, and shortly thereafter Mr. John Barsanti, Jr., a capable and experienced attorney (now president of the St. Louis Bar Association), was appointed to represent him. Mr. Barsanti, together with Mr. James W. Singer who was associated with him in the practice of law, entered their appearance for Kaufman, and both Mr. Barsanti and Mr. Singer thereafter represented Mr. Kaufman in preparing for the trial and in the trial itself.

Counsel properly filed a motion under 18 U.S.C. § 4244, for the determination of Kaufman's mental capacity, and the Court ordered him taken to the Medical Center at Springfield for examination. The diagnosis made at that institution was schizophrenic reaction, paranoid type, in partial, rather stable remission, but that Kaufman had a factual understanding of the proceedings against him and was able to assist rationally in his defense. On the basis of the report of that institution, the Court found Kaufman competent to stand trial.

While Kaufman was at the Springfield Medical Center, librium was regularly prescribed and administered to him. Librium is a tranquilizer, a drug commonly used for relief of symptoms of anxiety and tension. After he was returned to St. Louis in March 1964, and while confined in the St. Louis City Jail awaiting trial, Kaufman continued to take librium under prescription by the jail physician. This fact was disclosed at the trial by the Warden of the Jail testifying on behalf of Kaufman. However, there was not the slightest indication or contention at the time that Kaufman's use of librium affected to any extent whatsoever his ability to cooperate with and assist his counsel. In fact, Mr. Barsanti was of the opinion at the present hearing that it had no effect on Kaufman's ability to assist him at the trial.

The dosage which had been prescribed for Kaufman at the City Jail was 3 capsules daily of 5 mgm each. This is admittedly a very small amount, so much so that according to Kaufman, the prescribed dosage was insufficient to have any beneficial effect. His present story is that beginning in the latter part of March, instead of taking the librium "pills" as prescribed, and without the knowledge of anyone other than fellow prisoners, he would accumulate the capsules, and when he had saved some 10 or 15 he would distill them and inject them into his body by means of an eyedropper and syringe. In fact, his testimony was to the effect that he and other prisoners who were prescribed pills would use the pills in common.

Kaufman testified that each day during the trial, prior to leaving the jail for the court proceeding, he took 100 mgm of librium. His contention is that as a result of so doing, he was caused to become drowsy, sleepy and lackadaisical. In this connection, he swore that although he had discussed his case constantly (almost daily) with Mr. Singer and infrequently with Mr. Barsanti prior to trial, he did not, except on one occasion, say "one word" to his counsel during the trial itself, which lasted four days. On the other hand, Mr. Barsanti

quarters in New York City subsequent to his conviction and sentence. At his request and with the consent of the government's attorney, we obtained a copy of these records for the purpose of considering them in rendering our decision as fully as though they had been admitted in evidence. We now note that Kauf-

man was in error, since we find upon examination of the Court file that an identical copy of these records had in fact been included with the others forwarded by the Warden. However, neither this nor any other record of Kaufman's medical treatment subsequent to his conviction were offered in evidence.

testified that he conferred with Mr. Kaufman at a number of court recesses as well as on at least two mornings before the trial proceedings resumed for the day. He was aware of the fact that petitioner was taking librium, but since Kaufman's statements to him were consistent with the jail records it would appear that Kaufman made no disclosure of the fact, if so, that the quantity of librium actually taken by him was far in excess of what had been prescribed.

In any event, prior to the trial, Kaufman cooperated fully with his counsel and they were able to obtain from him all necessary material requested. At the trial Kaufman sat at the counsel table and there was nothing in his appearance which would indicate to his counsel (or to the Court for that matter) either drowsiness or a lack of awareness of the proceedings.

Dr. Hartman testified that a dosage of 100 mgm of librium is not uncommon and that its effect varies with the individual. He further testified that although such quantity would make a person drowsy, such drowsiness would be apparent to others, that is, the patient's head would droop, his eyelids close and he would doze. However, this state of drowsiness would last only 1 or 2 hours after the 100 mgm of librium were taken intravenously, and at the end of such period, the patient would return to a normal state of wakefulness.

It was Dr. Hartman's opinion that assuming Kaufman took the amount of librium he claimed, he would nevertheless be coherent, would understand the proceedings, and could communicate with counsel, and that his ability to assist counsel at his trial would not be impaired. The testimony of Mr. Barsanti corroborated Dr. Hartman's opinion. At all times, both before and during the trial, in the morning as in the afternoon, Kaufman gave no appearance of being drowsy. This Court personally observed Kaufman, and on occasion during recess talked with him, and in the judgment of the Court he was at all times alert, aware of what was transpiring, and capable of fully cooperating with and assisting his counsel.

■ Accepting, for the purpose of this motion, Kaufman's testimony that he accumulated the 5 mgm tablets of librium and that each morning during the trial, surreptitiously without the knowledge of his counsel, he took as much as 100 mgm of this drug mixed with other unknown drugs, we find and hold that the taking of said drugs did not affect Kaufman's ability to cooperate with and assist his counsel either before or during the trial, nor did it affect his appearance and demeanor during the trial.

■ We further find and hold that neither the physical ailments for which Kaufman was treated before and after the trial, as shown by the records subpoenaed by him and his testimony at the hearing, nor his emotional or any other condition alleged in his motions rendered him incompetent to participate in his trial nor prevented him from fully cooperating with his counsel in the preparation and defense of the charge against him. Kaufman's counsel not only was able to but did in fact give him effective assistance.

■ The supplemental motion to vacate, prepared by appointed counsel, asserts as a further ground for relief that certain physical evidence was obtained by an allegedly unlawful search and seizure of Kaufman's automobile after his arrest. The record does not substantiate this claim. In any event, this matter was not assigned as error on Kaufman's appeal from conviction and is not available as a ground for collateral attack on the instant § 2255 motion. See Warren v. United States, 8 Cir., 311 F.2d 673, 675 (1963); Springer v. United States, 8 Cir., 340 F.2d 950 (1965).

The final ground set forth in the supplemental motion is a suggestion, but not a positive assertion, that the Government knew where Marian Blake, a witness whom Kaufman unsuccessfully tried to subpoena, could be found but failed to disclose this knowledge to the defense.

The record shows that Marian Blake, a nurse, was one of a group of persons with whom Kaufman fraternized for a short period of time prior to his arrest. It is contended that her testimony would have tended to corroborate that of Patricia Scott concerning the alleged insanity or mental illness of Kaufman, and that because of her profession her testimony would have been of great value.

The record discloses that on May 15, 1964, Kaufman filed a motion requesting that Pat Scott, Marian Blake, and Detective Joseph Kiernan be subpoenaed at the expense of the government. The addresses of these three, all in New York, were set forth in an accompanying affidavit of Kaufman, which stated in general terms, that "he expects said witnesses to testify as to facts and circumstances pertaining to his mental condition immediately prior to December 16, 1963, the date of the offense." Subsequently, Kaufman filed two other affidavits, dated May 28, 1964, outlining at greater length the testimony he expected to adduce from these witnesses. One affidavit pertained to Detective Kiernan and the other related to Pat Scott and Marian Blake collectively, and again the address of each was specifically set forth.

On June 9, 1964, the motion for issuance of subpoenas was sustained, and subpoenas issued. A number of other subpoenas were also requested, and the witnesses were ordered subpoenaed at the government's expense. The only witness, other than Dr. Fredericks, not ultimately found by a federal marshal was Marian Blake. The marshal in New York City made a non est return on the Marian Blake subpoena, which was filed in Court June 29, 1964, stating that the witness had moved from the address given without leaving a forwarding address. There is no evidence whatever that Kaufman made any further inquiries or attempted to find Marian Blake during the period of almost two months which followed the filing of the non est return. We note that the trial commenced August 24, 1964. It would appear to us that one or more of the other associates of Kaufman in New York would have known where Marian Blake could be found, if her presence were really necessary.

Petitioner does not claim that the marshal's return was false or made in bad faith, nor does he contend that the United States Attorney for this District or anyone in or connected with his office had any knowledge of Marian Blake's whereabouts or even that any of them had actual knowledge that a non est return had been filed. There is no charge that the local officials were requested to search for or to find the witness, nor is there the slightest intimation that Marian Blake was made unavailable to Kaufman through the procurement of the government. In short, there was no concealment or suppression of evidence. Cf. Ferrari v. United States, 9 Cir., 244 F.2d 132, 141–142.

The motion directed to this point simply states, "upon information and belief that one Richard Stein, United States Attorney, Southern District of Indiana, stated that Marian Blake's whereabouts were known and that her brother worked for the Bureau of Prisons for the past five years." Kaufman was subsequently tried and convicted in Indiana in the spring of 1966, a fact which appears from a letter motion which he filed in this Court under Rule 35. Whatever Stein may have said was undoubtedly in connection with that case and at a time subsequent to the trial in this district.

In any event, assuming that Mr. Stein made the statement attributed to him on information and belief, or even that it would have been possible for Mr. Stein to have located Marian Blake had he been requested to do so, we see no possible basis either in law or in fact for Kaufman's present contention that this information was suppressed by the government in violation of his constitutional rights. Kaufman makes no claim that Mr. Stein was aware in June or even in August, 1964, that a subpoena had been issued for Marian Blake and that a non est return had been made in the Eastern District of Missouri, nor that any knowl-

edge Mr. Stein may have had in preparing the Indiana case for prosecution was communicated to the officials in this District. In these circumstances, whatever knowledge Mr. Stein may have had at some unspecified time as to the whereabouts of Marian Blake clearly cannot be imputed to the United States Attorney for the Eastern District of Missouri.

As stated supra, subpoenas were issued at the expense of the government, on petitioner's motion, for the appearance of certain witnesses, including the jail physician. The motion to subpoena other witnesses was denied, and we now reaffirm the propriety of that ruling as to each such witness.

■ (1) Dr. Ambellur Fredericks, a clinical psychologist, participated in an examination of petitioner in December, 1960, at the State Psychiatric Clinic in Jamestown, North Dakota, but has not seen or examined petitioner since then. Dr. Fredericks, now in Boston, Massachusetts, resigned from the Clinic in Jamestown in March, 1961. Any testimony he might now give, relating to an examination over six years ago and some four years prior to petitioner's trial, would be entirely too remote, even if it were otherwise relevant. In this connection we note that Dr. I. David Waitzel, the psychiatrist director of the Clinic (under whom Dr. Fredericks administered his psychological evaluation of petitioner), testified at great length at the trial of this case on behalf of petitioner.

(2) Richard Stein, the U. S. Attorney for the Southern District of Indiana, was said by petitioner to have testified at a pre-trial hearing conducted in connection with the Indiana prosecution. Petitioner's affidavit recites that he "expected to prove by him that during the course of the trial the Government knew of the whereabouts of Marian Blake and could have produced her for trial if the Government had made a diligent effort to do so." For the reasons stated supra, such allegation even if it were sustained, would be insufficient to warrant the grant of the relief here prayed.

(3) Marian Blake's presence at the hearing was sought for the purpose of allegedly proving that had she testified at the trial she would have "corroborated" the trial testimony of Patricia Scott. In arriving at our decision, we have made such assumption. We also note that the address now given for Marian Blake is the very same address listed on the subpoena which was returned non est on June 15, 1964, with the notation that she "moved from the address over 2 mos. ago and left no forwarding address."

■ (4) Jerry Smith, then a fellow prisoner in the City Jail and now confined in the U. S. Penitentiary at Terre Haute, Indiana, is alleged to have witnessed petitioner's mental agitation at the City Jail and to be able to corroborate the claim that petitioner "took a medication by injections as well as orally." Parenthetically, we note that nothing in this affidavit gave any notice that Smith could corroborate the accumulation by petitioner of a number of 5 mgm of librium tablets, and that petitioner administered to himself as much as 100 mgm daily during the trial. In testifying at the hearing petitioner stated that he had met Smith about a week and a half before trial, so obviously Smith could not have had any knowledge of what petitioner had done prior thereto. Petitioner further testified that other prisoners, including a Paul Hammer, participated with them in mixing, distilling and chewing drugs for self-administration. Yet petitioner sought only Smith's testimony, although presumably the other prisoners would have been more accessible to this Court. Under the circumstances, we were unwilling to order Smith's return from Terre Haute. In any event, to the extent that Smith could have corroborated petitioner's testimony, we have assumed such testimony to be true.

■ (5) The remaining witness whose personal presence was sought by petitioner is Patricia Scott, the same Patricia Scott for whom we had issued a writ of habeas corpus ad testificandum

July 2, 1964, requiring her to be brought at the government's expense from a correctional institution in New York State where she was then serving a term for attempted burglary. Miss Scott, a woman of admittedly low morals, the mother of three children, each born out of wedlock by different fathers, testified at petitioner's trial. The record also shows that prior thereto, petitioner's counsel had consulted with and obtained information from her additional to that within the knowledge of Kaufman. We have been advised that Miss Scott has since been deported to England where she now resides. The record shows that petitioner proposed marriage to Miss Scott on the first occasion he met her (August, 1963), and he professes to love her and her illegitimate children. The record also shows that Miss Scott does not return this love, but is interested only in whatever money and other benefits she may derive from his illegal activities. That Miss Scott would welcome an all-expense paid trip from England to the United States is understandable. So, too, is petitioner's desire to bring her back and thereby enable him once again to see the woman he "loves." It is unlikely, under the record, that petitioner would have another such opportunity for many years to come, since he is under sentence not only in this Court and in the Southern District of Indiana, but is also still to serve a term of some 7½ to 10 years consecutive to the sentence imposed in this Court for an offense against the State of New York to which he pleaded guilty. In any event, we see nothing of value that Miss Scott could contribute to a proper decision of this matter, and we certainly do not intend to retry the original case in this proceeding.

Significantly, nothing in either Miss Scott's or petitioner's affidavit pertaining to her proposed testimony relates to the claimed effects of librium on petitioner. All that she would testify to, other than matters which bear only upon Kaufman's guilt of the offense of which he was convicted, is that "petitioner was under serious emotional strain and was severely agitated prior to and during the trial." Even so, the evidence at the instant hearing clearly demonstrates, and we have so found, that such alleged emotional strain and agitation did not affect Kaufman's ability to cooperate with and assist his counsel.

It is simply not true that petitioner's counsel received little or no cooperation in the preparation and defense of the case against him. The picture which Kaufman attempts to paint, and which we reject, is that he was listless and drowsy during the trial, so much so that it adversely affected his appearance to the jury as well as his ability to assist counsel. No corroborative evidence from any of the many other persons present at the trial was adduced at the hearing. On this vital issue there is only the self-serving testimony of Kaufman himself, which was completely lacking in specifics as to his actual appearance and the respects in which he allegedly could have but did not cooperate with and assist his experienced counsel.

Petitioner has failed to sustain his burden of proof. The motion to vacate the judgment and sentence is overruled. The foregoing memorandum constitutes our findings of fact and conclusions of law.

