**Harold KAUFMAN, Petitioner,**

v.

**UNITED STATES of America,**
**Respondent.**

No. 66 C 218(2).

United States District Court,
E. D. Missouri, E. D.

Feb. 4, 1971.

**624**

Murry L. Randall, St. Louis, Mo., for petitioner.

Daniel Bartlett, Jr., U. S. Atty., St. Louis, Mo., for respondent.

## MEMORANDUM OPINION AND ORDER

REGAN, District Judge.

Petitioner's conviction for armed robbery of a federally insured savings and loan association was affirmed in Kaufman v. United States, 8 Cir., 350 F.2d 408, cert. den. 383 U.S. 951, 86 S.Ct. 1211, 16 L.Ed.2d 212. In his supplemental motion to vacate sentence and judgment, petitioner asserted as one ground for relief that evidence obtained as the result of an unlawful search and seizure was improperly admitted in the trial. In ruling that motion, we stated, inter alia, consistently with then controlling Eighth Circuit decisions that this alleged error was not available as a ground for collateral relief. Kaufman v. United States, D.C.Mo., 268 F.Supp. 484. The Supreme Court reversed (Justices Black, Harlan and Stewart dissenting), holding that "a claim of unconstitutional search and seizure is cognizable in a § 2255 proceeding." Kaufman v. United States, 394 U.S. 217, 89 S.Ct. 1068, 22 L.Ed.2d 227. The case was remanded to this Court for further proceedings consistent with the opinion of the Supreme Court.

On remand, we held a further evidentiary hearing at which the sole issue tried pertained to the allegedly illegal search and seizure. The evidence at this hearing consisted of the transcript of the original trial as supplemented by the testimony of petitioner and that of one of the special agents of the FBI (George Peet) who had also testified at the trial. We now decide the issue on the basis of such evidence and the reasonable inferences deducible therefrom.

Initially, we note that the Supreme Court did not consider the merits of Kaufman's claim, the case being remanded to this Court for that purpose, so that we write on a clean slate. We have carefully examined the trial record in the light of the additional evidence

adduced at the evidentiary hearing, and are convinced not only that Kaufman's Fourth Amendment claim is without merit but that if there was constitutional error in admitting any of the seized items, any such error was harmless beyond a reasonable doubt within the teachings of Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705. Cf. Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 and Thompson v. United States, 9 Cir., 382 F.2d 390, applying the "harmless error" doctrine to search and seizure cases. In so concluding, we are not unmindful of the differences between Mr. Justice Black and the majority in *Kaufman*. In the majority opinion, Mr. Justice Brennan stated,

> "Finally, MR. JUSTICE BLACK'S reliance on petitioner's concession of participation in the robbery is misplaced. That concession is irrelevant in light of petitioner's defense at trial based on insanity. Surely that defense, any more than any other defense, cannot be prejudiced by the admission of unconstitutionally seized evidence."

What is meant by the foregoing is simply that in applying "the harmless error beyond a reasonable doubt" rule, we must consider the evidence not only in respect to Kaufman's participation in the robbery but also determine whether it could have adversely affected his defense of insanity. Insofar as the robbery itself is concerned, there can be no question whatsoever that so overwhelming if not conclusive was the case against Kaufman, wholly aside from his concession that he had in fact committed the robbery, there is not the slightest possibility that the jury's decision on that issue could have been different absent the physical evidence of which complaint is now made. Cf. both the majority and dissenting opinions in Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284. Our study of the record has also convinced us that the evidence was equally harmless beyond a reasonable doubt insofar as concerns

Kaufman's insanity defense. Parenthetically, we note that a similar defense of insanity proved equally unsuccessful when Kaufman was tried in the Southern District of Indiana for robbing another savings and loan association on November 20, 1963. See United States v. Kaufman, 7 Cir., 393 F.2d 172.

As briefly summarized by the Court of Appeals on Kaufman's direct appeal, the undisputed evidence concerning the robbery showed the following: "About four p. m. on December 16, 1963, Kaufman, then 39, entered the office of the Roosevelt Federal Savings & Loan Association, River Roads Branch, in Jennings, Missouri. He conversed with two employees, pulled a gun, announced a holdup, and demanded and received cash in excess of $300 and travelers checks for $11,520. He then ordered everyone first into the manager's office and then into a storage room and departed. Shortly thereafter he was apprehended in Alton, Illinois, with the cash and checks in his possession."

When he was arrested in Alton, Illinois, at approximately 4:40 p. m. on December 16, 1963, Kaufman identified himself to the arresting officer as Donald Taylor, admittedly a fictitious name. Shortly before, the arresting officer, Corporal Charles Stahl, had received a message from his dispatcher to proceed to the entrance of a bridge which crosses the Mississippi River at Alton and stand by to wait for a 1963 red Rambler bearing a described New York license plate which had been involved in a hit-and-run accident in Missouri. Upon seeing the automobile, the officer followed it for several blocks and signalled for it to stop. Instead, the driver (Kaufman) made a right turn, the car skidded on the ice, went over the curb and hit a tree. The officer then placed Kaufman under arrest for a traffic violation, and called for a towtruck to remove the automobile from the street. As the two were leaving the scene of the arrest, Cliff Martin, the operator of the towing service arrived and towed the automobile to his privately-owned ga-

rage. The Missouri authorities were notified, and Kaufman was taken to the Alton police station by Stahl.

■ The first of the questioned items offered in evidence were two folders containing the travelers checks which had been stolen in the robbery. As to these, Kaufman's counsel at the time specifically stated that he had no objection, this being in line with his obvious trial strategy of conceding the fact of the robbery in order to strengthen the good faith of the sanity defense, particularly in light of the impossibility of refuting Kaufman's participation in the robbery. At best, the travelers checks themselves constituted cumulative evidence, much more so than was the evidence involved in Pope v. Swenson, 8 Cir., 395 F.2d 321. In the present case, the government proved by evidence entirely independent of the checks that they had been stolen at gunpoint in the robbery. We are at a loss to understand, and counsel for Kaufman has not enlightened us, how the admission of these travelers checks, in the circumstances of this case, could conceivably have borne upon, much less prejudiced, the defense of insanity.

■■ The next item offered in evidence by the government was the gun used in the holdup. This, too, could have related only to the actual robbery. No doubt for that reason, in line with counsel's trial strategy, the admission of the gun was not objected to. In addition to finding that the admission of the gun into evidence was harmless beyond a reasonable doubt to Kaufman's insanity defense, we are also of the opinion that the discovery of the gun was not the result of a search in the legal sense. Cf. Di Marco v. Greene, 6 Cir., 385 F.2d 556. And see United States v. Beard, 6 Cir., 381 F.2d 325.

It is certain that Martin, the owner of the towing service, was not looking for evidence of a crime. All he knew was that a disabled car involved in a street accident for which the driver had been arrested was ordered removed from the street. The evidence is to the effect that in accordance with his usual custom, Martin intended to check the automobile he had towed to his garage for any personal belongings which should be protected, and it was in so doing that he saw the gun, obviously visible, on the rear seat of the automobile. He then informed the Alton Police Department. Later, Officer Stahl came out to the garage where he told Martin to keep the gun until the FBI arrived.

In Harris v. United States, 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067, the Court held that where an officer opened the door of an impounded car for the purpose of rolling up a window in order to protect the car from the elements, and upon opening the door discovered the automobile registration card in plain view, the discovery of the card was not the result of an illegal search. "It has long been settled that objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced in evidence." See, to the same effect, United States v. Molkenbur, 8 Cir., 430 F.2d 563, 566. The present is a much stronger case for sustaining the admissibility of the gun as evidence than were the comparable facts in *Harris*. And to the extent that the observance of the gun by Martin could be deemed a "search," the fact that it was found by a private citizen acting on his own behalf precludes a Fourth Amendment contention. Cf. Burdeau v. McDowell, 256 U.S. 465, 41 S.Ct. 547, 65 L. Ed. 1048, and Barnes v. United States, 5 Cir., 373 F.2d 517.

■ As for the articles found on Kaufman's person (cash and a rental contract for the car), the record discloses that when Kaufman was being booked at the Alton police station following his initial arrest, the personal property on his person was inventoried. At that time the police were unaware of the robbery or of the fact that FBI agents were on their way to the police station. Although this inventory was referred to in the evidence as a "search", we doubt

whether in fact it was intended as one, but for present purposes we need not make a definitive ruling. Technically, no issue as to the items found on Kaufman's person is before us, inasmuch as Kaufman's supplemental motion makes complaint only of the allegedly unlawful search of the automobile.[1] We consider it only because of its relationship to the matters properly before us. Preliminarily, we observe that there is not the slightest basis in the evidence for any contention, and none is made, that Kaufman was arrested simply to give the officers a pretext to search his person. Under the facts, Officer Stahl had probable cause for arresting Kaufman for the reckless driving which he personally observed, as well as for excessive speed under the existing circumstances. United States v. Kaufman, 7 Cir., 393 F.2d 172, 175, cert. den. 393 U.S. 1098, 89 S. Ct. 892, 21 L.Ed.2d 789. And since Kaufman was already suspected, with good cause, of hit-and-run driving in Missouri, the officer's decision to take him into custody and book him at the station was reasonable. The so-called "search" of Kaufman's person was not intended to obtain any "fruits" of a crime or any evidence relating thereto, since all that was then known by the Illinois officers was that Kaufman was a reckless driver who had left the scene of an accident in another state. It does not comport with reason to contend that the police should not have removed and inventoried the contents of Kaufman's clothing when he was being booked at the police station. We hold that the "search" of his person was reasonable. Found in that search was a relatively small amount of money (including "bait" money) and the rental contract for the car Kaufman was driving. As for the money, the fact that it

had been taken in the robbery was not in dispute, any more than was the fact that the money orders were so taken. Neither the money nor the money orders could have had the slightest adverse bearing upon Kaufman's defense of insanity. So, too, the rental contract dated December 11, 1963, between the rental agency and an Arthur Cooper could not have prejudiced the defense of insanity. Kaufman was not a party to that contract.

This brings us to the search of the automobile. We briefly review the evidence as to the time sequence. In the course of their investigation of the robbery, Peet and another agent were dispatched to proceed in a northwardly direction. Shortly afterwards, hearing that an arrest had been made in Alton of a man driving a red car which had been involved in a hit-and-run accident on northbound Highway 67 in Missouri (a possible "escape route"), the alert agents proceeded directly to Alton to follow up what they felt was a "logical lead," arriving in Alton at approximately 5:45 p. m. They did not, however, radio ahead to the Alton police that they were coming. After identifying themselves to Kaufman and giving him *Miranda* warnings, the agents commenced interrogating him at about 5:55 p. m. In the course of the ensuing discussions between Kaufman and the FBI agents, Kaufman related his activities beginning with his departure from New York and including his stop to purchase a gun and ammunition, the robbery of the savings and loan association, his hurried departure from the scene of the robbery, the hit-and-run accident in Missouri, and ending with his arrest in Alton. The interrogation apparently continued until about 6:40 p. m., at which time Agent Peet relayed the information he had ob-

---

1. Long after the hearing and the filing of briefs, and pending our ruling on the motions as tried and submitted, an attorney retained by Kaufman after the hearing filed, without leave, a supplement to the supplemental motion in which, inter alia, the validity of the search of his person is attacked. This supplement is not before us. We note, however, that at the time of the hearing herein, Kaufman was personally asked if he had included all of the grounds available to him and he answered in the affirmative except as to one possible ground not relevant to the grounds stated in the supplement to the supplemental motion.

tained from Kaufman to the agent in charge of the office in St. Louis. At about 7 p. m. the United States Attorney in St. Louis was contacted, and upon his authorization Peet informed Kaufman that federal charges would be filed against him. Between 7 and 8 p. m. that evening, several witnesses to the robbery were brought to Alton to view Kaufman in a line-up, and subsequently Kaufman was brought back to St. Louis, arriving at or about 8:35 or 8:40 p. m. At about 7:30 p. m., two FBI agents were authorized to proceed to Martin's garage where the car was being held, and beginning at about 9 p. m. they searched the car for a period of some two hours. Thus, it was not until after Kaufman was in federal custody in Alton, charged with the robbery of the savings and loan association, that the automobile was searched.

■ While at the Alton police station, Kaufman told Agent Peet that he had stolen the car, thereby disclaiming ownership or any other rightful interest therein. In these circumstances, the FBI was authorized to check the car for identification. United States v. Graham, 6 Cir., 391 F.2d 439, 442–443. Clearly, the FBI had the right to rely on Kaufman's voluntary assertion that he had stolen the car and was thus in wrongful possession thereof. The question of Kaufman's standing to challenge the legality of the search is thus squarely presented.

■ The Fourth Amendment was designed to secure the right of *privacy*. The issue of standing was clarified in Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697. The question of whether a thief has standing to insist on a right of privacy in respect to an automobile he admits he stole was not involved in *Jones*. That case simply held that where the *offense itself* pertains to *possession*, no showing of stand-

ing is required to challenge the search, and that in other situations all that is required is that the defendant be *legitimately* on the premises which are searched. Here, the offense of which Kaufman was convicted is not one which involves possession,[2] and quite obviously, if the car was stolen he had no legitimate right to be in the car. In *Jones*, the Court noted that the right to complain of the search "would of course not avail those who, *by reason of their wrongful presence,* cannot invoke the *privacy* of the premises searched."

■ It is our view that as to places that are wrongfully possessed, a person should not be entitled to claim a right of privacy. It follows that unless Kaufman has demonstrated a legitimate right to possess the Rambler automobile, he may not challenge the search thereof. We hold that such right has not been demonstrated in this case. We start with the admitted fact that prior to the search, Kaufman unequivocally stated that he had stolen the Rambler in New York. We do not credit his recent testimony that at a later date (but apparently before trial and long after the search) he recanted this statement. His present version is that although Arthur Cooper in fact had rented the automobile in New York, such rental was really on Kaufman's behalf and in any event he had Cooper's consent to operate the vehicle. In this connection, we note various provisions of the Rental Contract which are inconsistent with Kaufman's testimony, wholly aside from the fact that it is not corroborated by Cooper. In the body of the Rental Agreement are explicit agreements that the car will not be removed from "this state" (New York) without the written consent of the rental agency, or 100 miles from point of origin (New York City), and that any failure to return the vehicle on or before the specified date (December 15, 1963) "may be treated the same as theft of ve-

2. This fact distinguishes the present case from Dyer Act prosecutions in which possession is usually the basis for conviction, a situation comparable to *Jones*. Glisson

v. United States, 5 Cir., 406 F.2d 423; Williams v. United States, 5 Cir., 412 F.2d 729.

hicle from street." Moreover, there is the further explicit provision, in capital letters, that the vehicle shall not be operated "By any person other than the Renter (Cooper) who signed the Rental Agreement." And in capital letters immediately below Cooper's signature is the equally explicit statement that "This Rental Agreement is not transferable."

■ However, we do not base our decision on the issue of standing. As we have noted, Kaufman had, prior to the search, admitted in detail to Agent Peet all relevant facts pertaining to the commission of the offense and his use of the automobile in perpetrating the crime. The search was made shortly after the federal authorities arrested him for the offense. At the time the FBI searched the car, it was *then* known to have been used as an instrumentality in the commission of the bank robbery, a federal offense, and Kaufman was *then* being held on *that* charge.

The present is not a case such as Preston v. United States, 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777, in which the only arrest was for vagrancy, and the "officers had no cause to believe that evidence of crime was concealed in the auto." Contrariwise, in Kaufman's case, that there was probable cause to search the Rambler automobile admits of no doubt. Equally true in our opinion is the fact that the federal search was not remote in time from the federal arrest. There was no antecedent state search of the car. We are aware that *Preston* also teaches that a search made at a place far removed from that of the arrest "is simply not incident to the arrest." Nevertheless, a finding that the search is not incident to an arrest is not the end of the matter. Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419. In *Chambers*, the Supreme Court held that "the search of an automobile *on probable cause* proceeds on a theory wholly different from that justifying a search incident to an arrest." The Court distinguished *Preston* because it was apparent that the officer who arrested Preston for vagrancy had no cause to believe that evidence of a crime was concealed in the auto. In light of *Chambers*, we hold that the search was reasonable without regard to the issue of standing. Cf. the recent cases of Heffley v. Hocker, 9 Cir., 429 F.2d 1321 and United States v. Golembiewski, 8 Cir., 437 F.2d 1212.

■ Found in the search of the car, in addition to the stolen money orders as to which defendant specifically waived objection, were a December 14, 1963 New York City traffic violation summons for alleged illegal parking, a December 15, 1963 receipt for gasoline purchased in Harrisburg, Pennsylvania, a December 15, 1963 receipt for road service at Willow Grove, Pennsylvania, and a December 15, 1963 telegraph receipt for a Western Union money order in the sum of $50 from "Paul King" to Pat Scott. (In her testimony for Kaufman, Miss Scott identified Paul King as Harold Kaufman).

We have carefully analyzed the foregoing exhibits in light of the insanity defense and cannot see the remotest possibility of any prejudice to that defense by the admission of these exhibits. That Kaufman was a resident of New York City was established by his own evidence. So, too, was the fact that once or twice a week he was wont to leave that city for the purpose of making a "score", the expression he used for robberies. And when he last left New York before his arrest in Alton he told Pat Scott, the woman he "loves", that it was his intention to "pull a job for Christmas." That the Rambler had been rented by Arthur Cooper in New York City is admitted. All that the traffic summons showed is that the automobile was still in New York in the early evening of December 14, 1963. The fact that Kaufman thereafter drove the car from New York to St. Louis is beyond dispute. He so told Peet. That he was required to purchase gasoline en route is perfectly

apparent, even absent any evidence, the distance considered.

The exhibits complained of are entirely consistent with Kaufman's insanity defense.[3] We note that none of the people who dealt with Kaufman in the transactions involved in the receipts objected to testified at the trial, so that Kaufman's outward appearance and mental state at the time he purchased the gasoline or sent the Western Union money order was not in evidence and could not have affected his defense.[4] And there is not the slightest suggestion in the record that Kaufman's mental condition was of such a nature that he could not conduct normal business transactions such as the purchase of gasoline or the transmission of money by Western Union [5] nor do the physical acts necessary to drive an automobile from New York to St. Louis. His skill as a driver is another matter. It appears from Miss Scott's testimony that he was as reckless a driver in New York as he proved to be in Missouri and Illinois.

Summarizing, we hold that the items as to which complaint is made were not obtained as a result of an unlawful search and seizure and were properly admitted in evidence. We further hold that even if any of such items were improperly admitted in evidence, any such error was harmless beyond a reasonable doubt and could not have prejudiced Kaufman on the issue of sanity. In view of the foregoing, we again overrule the supplemental motion to vacate judgment and sentence.

The foregoing memorandum constitutes our findings of fact and conclusions of law.

---

3. The testimony bearing upon the insanity defense is fairly summarized in the opinion of the Court of Appeals (350 F.2d, lc 410–413).

4. None of the exhibits were referred to in the medical testimony. We note, however, that the use of the name "King" by Kaufman in the money order receipt was attempted to be exploited to Kaufman's advantage in his counsel's interrogation of one of his expert witnesses (Dr. Glotfelty).

5. To the contrary, Miss Scott testified that Kaufman frequently purchased items for her children and others and took them to movies, etc.