## WALTER PALMER *v.* STATE OF MARYLAND

[No. 250, September Term, 1971.]

*Decided January 27, 1972.*

The cause was argued before MURPHY, C. J., and MOY-LAN and GILBERT, JJ.

*Barbara Kerr Howe* for appellant.

*Arrie W. Davis, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Samuel A. Green, State's Attorney for Baltimore County,* and *John J. Lucas, Assistant State's Attorney for Baltimore County,* on the brief, for appellee.

MOYLAN, J., delivered the opinion of the Court.

The convictions of the appellant, Walter Palmer, in the Circuit Court for Baltimore County by Judge Walter R. Haile, sitting without a jury, for the possession of narcotics paraphernalia and for the carrying of a concealed weapon present the question, "Does the thief have standing to object to the search of a stolen automobile?" The answer is, "No."

The very concept of "standing" is a latter-day consideration of the criminal law. It is an adjunct of the exclusionary rule, and serves as a limitation upon the operation of that rule.[1] It would have been an irrelevancy

---

1. See, for instance, Amsterdam, "Search, Seizure, and Section 2255: A Comment," 112 U. Pa. L. Rev. 378 (1964) at 389:

"As it [the exclusionary rule] serves this function, the rule is a needed, but grudgingly taken, medicament; no more should be swallowed than is needed to combat the disease. Granted that so many criminals must go free as will deter the constables from blundering, pursuance of this policy of liberation beyond the confines of necessity

until the adoption of the exclusionary rule in the Federal Courts in 1914 in *Weeks v. United States,* 232 U. S. 383; the partial adoption of the rule with respect to certain non-excepted misdemeanors in Maryland in 1929 by the so-called Bouse Act (Ch. 194, Acts of 1929; now codified as Art. 35, Sect. 5, Annotated Code of Maryland); and the elevation of the rule to a matter of constitutional dimension in 1961 in *Mapp v. Ohio,* 367 U. S. 643. Only then, and solely within the context of that rule, would it have come into play as a means of determining who had been "aggrieved" by an unlawful search and seizure and was, therefore, in a position validly to seek to suppress its fruits.

The wellspring of our modern law on "standing" is *Jones v. United States,* 362 U. S. 257, decided in 1960. Prior to *Jones,* standing to contest an unlawful search was narrowly restricted to those who had either a proprietary or possessory interest in the premises searched.[2] The law as to who had standing was largely derived from the common law rules of trespass to real property, presented subtle technical questions concerning property interests, and resulted in confusing and contradictory decisions.[3] The Maryland Court of Appeals first considered the question of standing, within the context of the Bouse Act, in 1932 in *Baum v. State,* 163 Md. 153, 157-158. Its holding, and those of the approximately 13 de-

---

inflicts gratuitous harm on the public interest as declared by Congress.
Let me put the case another way. In every litigation in which exclusion is in issue, a strong public interest in deterring official illegality is balanced against a strong public interest in convicting the guilty. As the exclusionary rule is applied time after time, it seems that its deterrent efficacy at some stage reaches a point of diminishing returns, and beyond that point its continued application is a public nuisance. The courts apparently have recognized this; the foggy doctrines of 'standing' and 'attenuation of taint' appear responsive to it."
See also *Alderman v. United States,* 394 U. S. 165, 174-175.
2. See Edwards, "Standing to Suppress Unreasonably Seized Evidence," 47 Nw. U. L. Rev. 471 (1952).
3. See White and Greenspan, "Standing to Object to Search and Seizure," 118 U. Pa. L. Rev. 333 (1970), at 338-339.

cisions that followed in its wake through 1960,[4] was not dissimilar to those in other state and Federal courts. It held, at 157:

> "From the above authorities, and many others which might be cited, it is certain that one cannot complain of an illegal search and seizure of premises or property which he neither owns, nor leases, nor controls, nor lawfully occupies, nor rightfully possesses, or in which he has no interest. Or, stating it conversely, those whose private rights have been or may be disturbed alone may invoke the constitutional right against unreasonable search and seizure. The constitutional and statutory provisions against unwarranted searches and seizures are made in favor of the persons whose property or possessions are affected by such search and seizure."

The pre-*Jones* restrictions on who had "standing" were harsh in two regards. They not only austerely limited the class of persons who had enough interest in the place searched or the thing seized to claim the protection of the Fourth Amendment,[5] but they also posed a cruel dilemma for those charged with crimes of possession. Where a defendant, in order to assert sufficient standing to challenge the admissibility of evidence, had to claim

---

4. See *Frankel v. State*, 178 Md. 553, 562 (1940); *Leon v. State*, 180 Md. 279, 286 (1942); *Bevans v. State*, 180 Md. 443, 448 (1942); *Resnick v. State*, 183 Md. 15, 18 (1944); *Kapler v. State*, 194 Md. 580, 586 (1950); *Lambert v. State*, 196 Md. 57, 63-64 (1950); *Delnegro v. State*, 198 Md. 80, 86 (1951); *Curreri v. State*, 199 Md. 54, 56 (1951); *Lingner v. State*, 199 Md. 503, 506 (1952); *Cross v. State*, 199 Md. 507, 509-510 (1952); *Saunders v. State*, 199 Md. 568, 573 (1952); *Rizzo v. State*, 201 Md. 206, 209 (1952); *Manger v. State*, 214 Md. 71, 75 (1957).

5. The fundamental notion that "standing" should be a precondition to raising a constitutional claim flows from Article III of the Constitution, limiting judicial consideration to real "cases" and "controversies." With certain exceptions not here relevant, it is not meet for a non-aggrieved party to assert the constitutional claims of a third party. See Sedler, "Standing to Assert Constitutional *Jus Tertii* in the Supreme Court," 71 Yale L.J. 599 (1962).

and to prove a proprietary interest in the very contraband the possession of which was the gravamen of the offense charged, and such damaging admissions could then be used by the prosecutor at the trial on the merits to establish the incriminating nexus between the defendant and the contraband, the defendant was faced with an intolerable "Hobson's Choice." [6] The dilemma was starkly delineated by Judge Learned Hand in *Connolly v. Medalie*, 58 F. 2d 629 (2d Cir. 1932), at 630:

> "Men may wince at admitting that they were the owners, or in possession, of contraband property; may wish at once to secure the remedies of a possessor, and avoid the perils of the part; but equivocation will not serve. If they come as victims, they must take on that role, with enough detail to cast them without question. The petitioners at bar shrank from that predicament; but they were obliged to choose one horn of the dilemma."

Although the Supreme Court had dealt obliquely with questions of "standing" in *McDonald v. United States*, 335 U. S. 451 (1948) and *United States v. Jeffers*, 342 U. S. 48 (1951), it did not meet the subject squarely until its seminal decision in *Jones*. Justice Frankfurter there spoke for a unanimous court.[7] *Jones* liberalized the "standing" requirement significantly, mitigating its earlier harshness in both of its manifestations.[8]

---

6. A Lancashire comedy wherein Hobson, the proprietor of a turn-of-the-century Midlands bootery, is faced with an ostensible choice between two equally unpalatable alternatives, in turn derived from Thomas Hobson (1544?-1631), an English liveryman at Cambridge, whose practice of requiring every customer to take the horse which stood nearest the door gave rise to the expression "Hobson's choice."

7. Justice Douglas joined in both the holding and the opinion of the Court on the question of "standing", but dissented from the distinct and separate holding that the warrant application under review showed probable cause.

8. Note, "Standing to Object to an Unlawful Search and Seizure," 1965 Wash. U.L.Q. 488; Weeks, "Standing to Object in the Field of Search and Seizure," 6 Ariz. L. Rev. 65 (1964); Comment,

*Jones* first removed a defendant from the horns of Learned Hand's dilemma. It pointed out that the government, as well as the defendant, was faced with a choice of contradictory positions and would be engaging in mere *"elegantia juris"* in seeking to avoid its impossible choice simply by deferring to the defendant and requiring him to choose first. It conferred "automatic" standing on one charged with possession, thereby permitting him to challenge the seizure of those goods the possession of which was the gravamen of the offense. The Court said, at 263-264:

> "The same element in this prosecution which has caused a dilemma, i.e., that possession both convicts and confers standing, eliminates any necessity for a preliminary showing of an interest in the premises searched or the property seized, which ordinarily is required when standing is challenged. . . .
> The possession on the basis of which petitioner is to be and was convicted suffices to give him standing under any fair and rational conception of the requirements of Rule 41(e)." [9]

See *Walters v. State*, 8 Md. App. 583, 589-590.

The Court also recognized that "standing" to challenge a seizure by virtue of an "interest in" the thing seized [10]

---

"Standing to Object to Unreasonable Search and Seizure," 34 Mo. L. Rev. 575 (1969); Note, "The Exclusionary Rule and the Question of Standing," 50 Geo. L.J. 585 (1962); Note, "Standing and the Fourth Amendment," 38 Cin. L. Rev. 691 (1969); Note, "Search and Seizure: Admissibility of Illegally Acquired Evidence Against Third Parties," 66 Col. L. Rev. 400 (1966).

9. In *Walters v. State*, 8 Md. App. 583, at 590-591, n. 7, we recognized that Rule 41(e) of the Federal Rules of Criminal Procedure is sufficiently comparable to the provisions of Maryland Rule 729 "as to make the rationale of the holding in *Jones* applicable."

10. The very nature of the goods seized can create difficult problems in terms of the applicability of *Jones'* first rationale—the conferring of automatic standing to avoid the dilemma. In Grove, "Suppression of Illegally Obtained Evidence: The Standing Requirement on its Last Leg," 18 C. U. L. Rev. 150 (1968), 156-162, it is pointed out that four separate categories of seized goods

is a question distinct and analytically severable from that of "standing" to challenge a search by virtue of an "interest in" the place searched.

The more significant liberalization of the "standing" requirement effected by *Jones* was the broadening of the class of persons who have an "interest" in a premises or place searched and are therefore entitled to be "aggrieved" at an unconstitutional intrusion. Justice Frankfurter set out the rationale for the broadening of the protection, at 266:

"We do not lightly depart from this course of decisions by the lower courts. We are persuaded,

---

may be involved and that each calls for separate analysis in terms of the applicability of *Jones*' automatic standing:

(1) Contraband Per Se—This category comes squarely within the holding of *Jones*. It is involved when the charge is, for example, the possession of narcotics, gambling paraphernalia, prohibited firearms, untaxed whiskey, or other items which are contraband as such. Maryland clearly confers automatic standing in such cases. See *Walters v. State, supra,* 589-590, 592; *Anderson v. State,* 9 Md. App. 532.

(2) Derivative Contraband — Typical of this category would be the stolen goods where the charge is receiving stolen goods. The items seized are not contraband per se but the possession of them, under a charge such as receiving, is nonetheless the gravamen of the offense. Maryland also confers standing in these situations. See *Anderson v. State, supra,* as to the receiving stolen goods indictment.

(3) Fruits of a Theft—Stolen goods again would be involved in this category, except that here the charge would be larceny, burglary or robbery and the possession of the goods would represent the predicate from which the inference of theft could be drawn. The language of *Jones* was that, "In cases where the indictment itself charges possession, the defendant in a very real sense is revealed as a 'person aggrieved by an unlawful search and seizure' upon a motion to suppress evidence prior to trial." In these cases, of course, possession per se is not the offense. Maryland has never been called upon to decide this question. *Simmons v. United States,* 390 U. S. 377, may well have rendered the question moot. See n. 12, *infra.*

(4) Evidentiary Items—Here would be represented items whereof possession is not a crime and wherefrom an inference of theft cannot be drawn. These items would, nevertheless, have evidentiary value in proving the crime charged. Few courts have ever extended the automatic standing of *Jones* to this type of goods seized.

however, that it is unnecessary and ill-advised to import into the law surrounding the constitutional right to be free from unreasonable searches and seizures subtle distinctions, developed and refined by the common law in evolving the body of private property law which, more than almost any other branch of law, has been shaped by distinctions whose validity is largely historical. . . .

Distinctions such as those between 'lessee,' 'licensee,' 'invitee' and 'guest,' often only of gossamer strength, ought not to be determinative in fashioning procedures ultimately referable to constitutional safeguards."

*Jones* then explicitly broadened the class of persons protected by taking the "standing" which was already available to persons who had a proprietary or possessory interest in the premises and extending it to all who are legitimately upon the premises, at 267:

"No just interest of the Government in the effective and rigorous enforcement of the criminal law will be hampered by recognizing that anyone legitimately on premises where a search occurs may challenge its legality by way of a motion to suppress, when its fruits are proposed to be used against him."

Significantly for present purposes, *Jones* then underscored its measured use of the adverb "legitimately" by stating the converse:

"This would of course not avail those who, by virtue of their wrongful presence, cannot invoke the privacy of the premises searched."

The law of "standing" as announced by *Jones,* as an adjunct to the exclusionary rule, entered the Fourteenth Amendment in June of 1961, in the train of *Mapp. Ker v. California,* 374 U. S. 23; *Belton v. State,* 228 Md. 17; *Kleinbart v. State,* 2 Md. App. 183.

Thus, in the wake of *Jones*, "standing" may rest upon any of three theoretical bases:

(1) Automatic standing;
(2) Standing based upon relationship to the situs of the search, either
   (a) present possessory interest in the property searched, or
   (b) legitimate presence upon the premises; and
(3) Standing based upon relationship to the property seized.[11]

The statements of the Supreme Court on the question of "standing" since *Jones* have simply been interpretive. *Katz v. United States*, 389 U. S. 347, and *Mancusi v. De-Forte*, 392 U. S. 364, together established that, since the Fourth Amendment protects persons rather than property, the protected "premises" will be construed to include any "area in which there is a reasonable expectation of freedom from governmental intrusion." *Alderman v. United States*, 394 U. S. 165, reiterates that "Fourth Amendment rights are personal rights which . . . may not be vicariously asserted." *Simmons v. United States*, 390 U. S. 377, holds that whenever a defendant takes the stand at a suppression hearing to contest the legitimacy of a search or seizure, his testimony thereat may not be used against him at the trial upon the merits.[12]

---

11. In Grove, "Suppression of Illegally Obtained Evidence: The Standing Requirement on its Last Leg," 18 C. U. L. Rev. 150 (1968), it was suggested that there might well be a fourth theoretical basis for "standing"—so-called "derivative standing," whereunder one co-defendant could avail himself of the Fourth Amendment violations committed against another co-defendant. This rather tenuous theory was based upon a mere plurality opinion in *McDonald v. United States*, 335 U. S. 451 (1948). Whatever vitality there may have been in that theory was eroded by *Wong Sun v. United States*, 371 U. S. 471 (1963), and clearly administered the *coup de grace* by *Alderman v. United States*, 394 U. S. 165.

12. The *Simmons* decision probably renders the first of the alternative holdings of *Jones* on the question of "automatic standing" superfluous. It permits a defendant to raise a Fourth Amendment claim and to testify with respect to that claim with absolute im-

It is the "legitimately on the premises" aspect of the appellant's relationship to the place searched that concerns us in the case at bar. At approximately 3:30 p.m. on January 24, 1971, a State trooper flagged down the 1960 Pontiac being driven by the appellant and occupied by one other passenger on U.S. Route 40 in the area of Middle River. The car bore Florida license tags. A radio check revealed that the car had been stolen three days earlier in Jacksonville, Florida. A second trooper responded to the scene and proceeded to search the automobile. Recovered therefrom were a hatchet (from under the driver's seat) and a small box containing six syringes, a leather cord and several pink capsules. Also recovered was a small metal whiskey bottlecap, which was burned on the bottom, which had a clothespin around it, and which had two or three long hollow plastic tubes with needles on one end and eyedropper tops on the other end. The appellant admitted the ownership of the narcotics paraphernalia found under the driver's seat, admitted that he had been a narcotics user for twenty years and admitted that he had purchased the two capsules in Washington, D. C., believing them to be heroin.

The appellant challenges the search of the automobile as not being based upon probable cause. It is unnecessary even to consider that issue on its merits because of our belief that the appellant had no "standing" as to that stolen automobile.

In interpreting the "legitimately on the premises" aspect of *Jones*, this Court has consistently denied "standing" to trespassers in or upon real property. *Brooks, Keaton and Patterson v. State,* 13 Md. App. 151, 157; *Middleton v. State,* 10 Md. App. 18, 29-30; *Jason v. State,* 9 Md. App. 102, 109. The rationale applies with equal vigor to the thief vis-a-vis the stolen automobile.

---

munity from any later use by the prosecutor at the trial upon the merits of his testimony or of his assertion. Since the defendant is no longer faced with the intolerable choice of asserting his Fourth Amendment claim only at the risk of waiving his Fifth Amendment privilege against self-incrimination, the dilemma has been removed which was the sole predicate for the first holding of *Jones.*

In so holding, we are not unmindful of *Cotton v. United States,* 371 F. 2d 385 (9th Cir. 1967), but find it unpersuasive. The *Cotton* case stands alone for the proposition that the thief does have rights in the stolen vehicle, as an adverse possessor, superior to all the world except the true owner. Since the *Cotton* case involved a prosecution for a Dyer Act violation of transporting a stolen vehicle across state lines, it could well have reached its conclusion that there was "standing" by relying directly on the "automatic standing" aspect of *Jones.* It gratuitously foreswore such an approach, and chose to reach the second issue. Its purported reliance on *Simpson v. United States,* 346 F. 2d 291 (10th Cir. 1965), is misplaced, since *Simpson,* another Dyer Act case, does rely on the "automatic standing" aspect of *Jones* by virtue of the fact that the possession of the stolen vehicle was the gravamen of the charge.

Both the overwhelming weight of authority and, we feel, the better reasoning are represented by the cases which hold squarely that the thief has no "standing" in the stolen automobile. *Kaufman v. United States,* 323 F. Supp. 623 (E.D. Missouri 1971); *Williams v. United States,* 323 F. 2d 90 (10th Cir. 1963); *State v. Pokini,* 367 P. 2d 499 (Hawaii, 1961); *Slyter v. State,* 149 So. 2d 489 (Mississippi, 1963); *Harper v. State,* 440 P. 2d 893 (Nevada 1968); *State v. Edmonds,* 462 S.W.2d 782 (Missouri 1971); *Meade v. Cox,* 310 F. Supp. 233 (W. D. Virginia 1970). Even more compelling than the precedents from our sister jurisdictions, however, is the inherent logic of the proposition. No valuable social purpose could conceivably be served by extending the protection of the Fourth Amendment to a thief in the enjoyment of the stolen automobile.[13]

---

**13.** Although only of academic interest, the Note, "Standing to Object to an Unreasonable Search and Seizure," 34 U. of Chi. L. Rev. 342 (1967), argues with impeccable logic that the Supreme Court's decision in *Linkletter v. Walker,* 381 U. S. 618 (1965), rendered the entire "standing" doctrine obsolete. From *Weeks* through *Mapp,* the Supreme Court had predicated its employment of the exclusionary rule on the remedial benefit to the target of

170

The appellant raises a second contention that the evidence was not legally sufficient to sustain the charge of carrying concealed a dangerous and deadly weapon. From its presence, hidden under the driver's seat which was occupied by the appellant, the trial judge concluded that it was being carried concealed by the appellant. *Evans v. State,* 11 Md. App. 451, 459, is clear support for the trial court's position.

The appellant's final contention is that the State failed to prove that he had any intention of using the controlled paraphernalia in the State of Maryland. He misreads the requirement of the law. Article 27, Section 287, provides, in pertinent part, that it shall be unlawful for any person:

"(d) To possess or distribute controlled para-

---

the unlawful search or seizure. Whether bottomed on a "self-incrimination" theory flowing from the "mystic union" of the Fourth and Fifth Amendments or upon a "personal incrimination" theory stemming from the Fourth Amendment alone, the remedial rationale conferred a "standing" upon those whose property or privacy had been invaded, where it clearly did not confer "standing" on others.

In *Linkletter,* however, the Supreme Court rewrote the rationale of *Mapp.* It indicated that the exclusionary rule was based exclusively on a "general deterrence" rationale and that the class of persons sought to be protected by the rule are "the unknown potential victims of unreasonable future police conduct." By stressing prophylaxis and stating that all citizens are equally "aggrieved" at unlawful police conduct, the court, *ipso facto,* would seem to have done away with the fine discriminations implicit in the notion of "standing."

California, significantly, followed where its own similar logic led. In *People v. Cahan,* 282 P. 2d 905 (1955), it had adopted its own exclusionary rule and recognized that it was based on the "general deterrence" theory of "policing the police." Shortly thereafter, in *People v. Martin,* 290 P. 2d 855 (1955), California abolished the "standing" requirement as a precondition to asserting a Fourth Amendment violation. Justice Traynor distinguished the precedents from lower Federal courts which retained standing requirements, because they were based on the "personal incrimination" theory of the exclusionary rule whereas California based its exclusionary rule on the "general deterrence" theory. He recognized that "standing" depends for its very life not simply upon the existence of the exclusionary rule but upon the reason for the existence of the exclusionary rule.

What then did *Linkletter* portend for the future of "standing"? Undeterred by any compulsion toward doctrinal consistency, the Supreme Court in *Simmons, Mancusi v. deForte,* and *Alderman* demonstrated that the "standing" doctrine is still in good health, despite the apparent destruction of its doctrinal underpinnings.

phernalia which shall mean (i) a hypodermic syringe, needle or other instrument or implement or combination thereof adapted for the administration of controlled dangerous substances by hypodermic injections under circumstances which reasonably indicate an intention to use such controlled paraphernalia for purposes of illegally administering any controlled dangerous substance."

It is the possession which is the *actus reus* of the crime. The "intention to use such controlled paraphernalia for purposes of illegally administering any controlled dangerous substance" is the *mens rea* of the crime. That mental state may be a very generalized one, bent upon future use, to be sure, but not necessarily pinpointing a specific time and place. We hold that it is the situs of the possession which confers jurisdiction over the offense and not the highly speculative situs of intended future use.

*Judgments affirmed.*