SHERMAN DUNCAN ALIAS JAMES FITZ AND CORNELL SMITH *v.* STATE OF MARYLAND

[No. 967, September Term, 1974.]

*Decided June 30, 1975.*

The cause was argued before MORTON, THOMPSON and MOYLAN, JJ.

*Dennis M. Henderson, Assistant Public Defender,* with whom were *Alan H. Murrell, Public Defender,* and *Arnold M. Zerwitz, Assistant Public Defender,* on the brief, for appellants.

*Arrie W. Davis, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General,* and *Robert S. Rothenhoefer, State's Attorney for Frederick County,* on the brief, for appellee.

MOYLAN, J., delivered the opinion of the Court.

Courts occasionally leap headlong into the merits of a

controversy with scant thought to the preliminary question of whether the controversy is even justiciable in the first instance. This appeal permits us to linger upon the threshold and to explore the fascinating, though frequently overlooked, contours, peculiar characteristics and procedural mysteries of the threshold itself. What is the rite of passage by which one crosses? Who bears the peril of the crossing? The prime issue in the case before us is:

Who has the burden of producing evidence on the question of standing to raise a Fourth Amendment protest?

It is, of course, black letter law that only a "person aggrieved by an unlawful search and seizure" may challenge the constitutional validity of that search and seizure. *Jones v. United States*, 362 U. S. 257, 261, 80 S. Ct. 725, 4 L.Ed.2d 697, 702 (1960). It is not enough that someone's right to be free of unreasonable search and seizure has been abrogated; it is necessary that the right abridged be that of the defendant personally. *Alderman v. United States*, 394 U. S. 165, 173, 89 S. Ct. 961, 22 L.Ed.2d 176, 186 (1969). One must establish that it is *his own* direct or derivative enjoyment of property or expectation of privacy that has been invaded before he may challenge the invasion. *Walters v. State*, 8 Md. App. 583, 261 A. 2d 189; *Palmer v. State*, 14 Md. App. 159, 286 A. 2d 572; *Lopata v. State*, 18 Md. App. 451, 307 A. 2d 721; *Brown v. United States*, 411 U. S. 223, 93 S. Ct. 1565, 36 L.Ed.2d 208 (1973).

We are not here concerned with the question of what is the appropriate burden of proof at a suppression hearing once a justiciable issue is properly before the hearing judge. It was settled by *Lego v. Twomey*, 404 U. S. 477, 92 S. Ct. 619, 30 L.Ed.2d 618 (1972), that that burden is a preponderance of the evidence. Nor are we concerned with the allocation of the burden of going forward with the evidence on the merits of a search and seizure question. It is clear that that burden shifts, depending on the presence or absence of a search warrant. When the police execute a search under authority of a facially adequate warrant, it is presumptively good and the burden is upon the defendant to establish its invalidity. Where the evidence is inconclusive in

this regard, the State wins. *United States v. Ventresca,* 380 U. S. 102, 85 S. Ct. 741, 13 L.Ed.2d 684 (1965); *Aguilar v. Texas,* 378 U. S. 108, 84 S. Ct. 1509, 12 L.Ed.2d 723 (1964); *Alderman v. United States, supra; Hignut v. State,* 17 Md. App. 399, 408-410, 303 A. 2d 173. Where, on the other hand, the defendant establishes initially that the police proceeded warrantlessly, the burden shifts to the State to establish that strong justification existed for proceeding under one of the "jealously and carefully drawn" exceptions to the warrant requirement. *Jones v. United States,* 357 U. S. 493, 499, 78 S. Ct. 1253, 2 L.Ed.2d 1514, 1519 (1958). Where the evidence is inconclusive in this regard, the defendant wins. *Coolidge v. New Hampshire,* 403 U. S. 443, 454-455, 91 S. Ct. 2022, 29 L.Ed.2d 564, 576 (1971); *Katz v. United States,* 389 U. S. 347, 357, 88 S. Ct. 507, 19 L.Ed.2d 576, 585 (1967); *United States v. Jeffers,* 342 U. S. 48, 51, 72 S. Ct. 93, 96 L. Ed. 59, 64 (1951); *McDonald v. United States,* 335 U. S. 451, 456, 69 S. Ct. 191, 93 L. Ed. 153 (1948). Nor are we concerned with the rules of admissibility at such a hearing. *United States v. Matlock,* 415 U. S. 164, 94 S. Ct. 988, 39 L.Ed.2d 242 (1974), established that the formal rules of evidence are suspended and that the decision as to the receipt of evidence is left to the broad discretion of the hearing judge.

All of the foregoing questions are involved with what transpires within the forum of the suppression hearing. We are here concerned, rather, with the very passkey to that forum. The fundamental issue before us, on the question of standing even to raise and adjudicate a Fourth Amendment question on its merits, is that of Who has the initial burden of producing evidence? Must the defendant establish standing to raise the issue or must the State establish non-standing to avoid the issue? If, on the motion to suppress, neither establishes anything, who wins the nothing-nothing tie?

The issue is squarely raised, for the present appeal confronts us with a pair of nothing-nothing ties.

The appellants, Sherman Duncan (alias James Fitz) and Cornell Smith, were jointly arrested in Frederick County on June 18, 1973. They were jointly charged in a two-count

indictment with (1) grand larceny and (2) receiving stolen goods. Although both ultimately elected court trials, a difficulty in arranging for legal representation by Duncan resulted in a trial severance. Smith was tried in the Circuit Court for Frederick County by Judge Robert E. Clapp, Jr., on January 22, 1974, and was found guilty of the first count, charging grand larceny. Duncan was tried in the Circuit Court for Frederick County by Judge Ralph G. Shure on January 24, 1974, two days later, and was found guilty of the second count, charging the receipt of stolen goods. Notwithstanding the separate trials, the evidence produced was so virtually identical and the issues here presented are so overlapping in significant part, that it serves the purpose of judicial husbandry to consolidate the consideration of these appeals within a single opinion. Any minor differences in the relevant testimony will be noted.

The key contention raised by each defendant is that the stolen goods were turned up by the police in the course of an allegedly unconstitutional search of the automobile with which both appellants were linked by several witnesses. Duncan, in the course of his trial, moved to suppress the fruits of that search. His motion was denied. Smith, by a written motion filed just before his trial commenced, moved to suppress the physical evidence. His motion recited:

> "1. That your Petitioner was arrested on a public street in the City of Frederick, Maryland without an arrest warrant. That the police after arresting the Petitioner proceeded to search a car in which Petitioner was a passenger and without the Petitioner's permission or with a search warrant.
>
> 2. That evidence was illegally seized by the police and should not be introduced at trial."

Evidence bearing on the motion was adduced during the course of the trial. Smith's motion was also denied. Unlike the situation facing the Supreme Court in *Combs v. United States*, 408 U. S. 224, 92 S. Ct. 2284, 33 L.Ed.2d 308 (1972), the State's Attorney, in arguing against the motions in both cases, clearly raised the issue of standing.

The victimized store in this case, Montgomery Ward's, is located in the Fredericktown Mall on the north side of U.S. Route 40 just west of the city of Frederick. Until several bags of stolen merchandise still containing the price tags were recovered by the police from the trunk of a white Mercury at approximately 5 p.m. on June 18, 1973, the personnel at Montgomery Ward's did not realize that a larceny had taken place. The security personnel at the nearby J. C. Penney store, also located in the Fredericktown Mall, were, however, very alert to an attempted larceny of their merchandise at approximately 4 p.m. Two Negro males had been observed putting clothing into big trash bags and then carrying them out of the store, where they were set in trash cans just outside of a Pappy's Restaurant. A security officer took up a surveillance point to observe whoever might come by to retrieve the merchandise temporarily "stashed" in the trash cans. He observed two Negro males approach in a white Mercury, with a damaged front end, and bearing Maryland license tags KR 4679. When they, in turn, observed him, they drove off at a high rate of speed, "laying down rubber." The police were immediately notified.

Mrs. Mary Joan Maher lived on Grove Hill Road, a residential cul-de-sac, located just south of U.S. 40 across from the entrance to the Fredericktown Mall. At approximately 4 p.m. on June 18, she observed a white Mercury drive off the road and park on her front lawn. Two Negro males, strangers to her, alighted from the car, turned away when they saw her looking out of the door, and walked back toward Route 40. She notified the police. The two appellants were ultimately arrested as they were walking along the road several hundred yards away. Mrs. Maher and another neighbor identified them as the occupants of the white Mercury. The Mercury was the car that had been observed a few minutes earlier by the security officer of J. C. Penney's.

A warrantless search of the trunk of the automobile produced the goods stolen from Montgomery Ward's. This was the corpus delicti. The two witnesses from Grove Hill Road (with a peripheral assist from the security man at J. C.

Penney's and the proximities of time and place) established the criminal agency of the appellants.

The evidence at both trials on the question of standing was singularly unilluminating. As to whether either appellant had any proprietary or rightful possessory interest in the searched automobile, or was legitimately in the automobile by virtue of being a guest, invitee, licensee or bailee of the rightful owner or possessor, the record is a virtual blank. Neither appellant took the stand; neither appellant offered any witnesses in this (or any other) regard. The only testimony came from the State's witnesses. Mrs. Maher saw the appellants get out of the car, but this observation is neutral on the issue of standing. Thieves and unauthorized users of automobiles alight in the same fashion as rightful owners. Indeed, the somewhat bizarre leaving of the automobile on a front lawn in a strange residential neighborhood and then walking an appreciable distance away with no discernible destination is at least as compatible with abandoning a "hot" car as with the sensible parking of a car rightfully possessed.

At the trial of Duncan, Lt. Gary Heerd testified that the two appellants affirmatively disclaimed any interest in or knowledge of the car:

> "I myself asked them if this was their vehicle or if they knew whose vehicle it was and they denied it. They said it was not their car. They did not know whose it was or how it got there."

Similar testimony was produced at the trial of Smith. Pvt. Maybush testified:

> ". . . Lt. Heerd came up and asked the subjects, was it their vehicle and if they had any knowledge how the vehicle got there and both of them stated that it was positively not their vehicle. They had never seen it before.
> Q. What did they state?
> A. They said positively it was not their vehicle and

they had never seen it before. Didn't know how
it got there.

Q. They had no knowledge of that vehicle?

A. No, sir."

Lt. Heerd again testified:

"When they were brought to the scene of the car I
myself asked them whether, in fact, that was their
car or if they knew whose car it was. They denied it.
They did not know whose car it was or who had the
car."

Det. Corp. Himes also testified:

"[A]t the time they denied any knowledge of the car
that was parked in the yard. They repeatedly stated
that they had no connection with it, had not
driven it there, had not parked it there and an-
swers of that nature."

Neither appellant at any time offered any evidence to
controvert this evidence.[1]

In both trials, it was brought out that the police made a
radio check to learn if the car had been reported stolen. It
had not been so reported. The police checked further with
the Department of Motor Vehicles to ascertain the name of
the owner. At the trial of Duncan, this name was not
forthcoming. It was simply established that at some time on
the early evening of June 18, the police called the home of
the owner and spoke with a young child. A message was left
with the child asking the owner to return a call to the police
in Frederick. It does not appear from the record that any
return call was ever made.

At the trial of Smith, it was developed that the owner of

---

1. Even though hearsay, the declarations of the two appellants made to
the various policemen were admissible substantively upon any of three
theories: (1) Although hearsay, it was unobjected to, (2) As declarations by
a party opponent, they are a recognized exception to the Hearsay Rule, and
(3) The formal rules barring hearsay evidence do not apply at a suppression
hearing before the judge alone. *United States v. Matlock, supra.* In any
event, such evidence by the State tending to establish non-standing is
superfluous if the burden is upon the appellants to establish standing.

record was "a Shirley Ann Duncan. . . of 5229 St. Charles Avenue in Baltimore." No direct contact was established with M's Duncan and nothing was established as to who M's Duncan might be. Smith seeks some solace in the fact that the last name of the registered owner of the automobile corresponds with the last name of his companion and codefendant. No relationship was ever established, let alone permission to use the automobile. In this regard, even the acknowledged fact of a father-son relationship did not establish, *ipso facto*, any permitted use by the son of the father's farm in *Combs v. United States, supra. A fortiori*, a mere similarity of last names, particularly so common a Scottish name as Duncan, will not give rise to an inference of relationship with that inference, in turn, giving rise to an inference of permitted use. Even this tendril of strained logic was not, of course, developed during Duncan's suppression hearing and is not available to him.[2]

## The Allocation of the Burden

The end result of both hearings on the question of standing is that the appellants did not affirmatively

---

2. Even if one could accept the improbable inference that the registered owner of the automobile and the appellant Duncan were related from the mere fact that they both had the same last name and even if one could pile upon that inference the further inference that the use of an unspecified relative's car is with that relative's permission, the appellants here would not be helped. To begin with, such strained logic would at most give rise to permitted inferences and not to mandatory presumptions. The fact finder on the issue would, therefore, have full prerogative not to draw one or both of the inferences. More pertinently, however, the name of Shirley Duncan never came out in the trial of the appellant Duncan and the whole tenuous theory is, therefore, unavailable to him. At the trial of Smith, on the other hand, a permitted inference piled upon a permitted inference would at most give rise to the possibility that Smith's codefendant Duncan had been lawfully in possession of the car. Smith's legitimate presence therein, as a passenger, would be only derivative, coming through Duncan. When one relies upon the derivative standing of being "legitimately on the premises [or, by logical extension, in the car] as a guest, licensee or invitee" of a lawful possessor, such standing is only available when one is physically present in the searched premises at the time of the search. The appellant Smith was not so present. *Brown v. United States, supra*, is absolutely dispositive on this point. In that case, two defendants who were under federal arrest in Ohio during an unconstitutional search of the premises in Kentucky of their codefendant were not physically present in the premises during the search and could not, therefore, claim derivative standing. Presence during the search is a *sine qua non* of derivative standing.

establish any direct or derivative right in the searched automobile[3] and must fail, if the burden of producing evidence is theirs. By the same token, the State arguably did not affirmatively establish any lack of standing and would fail, if the burden were on it. We look then to the question of Who has the burden?

Until the partial establishment of the Exclusionary Rule in Maryland with the enactment of the Bouse Act in 1929 (Ch. 194, Acts of 1929), the very notion of standing was an irrelevancy. Between the enactment of the Bouse Act and the Supreme Court's opinion in the case of *Cecil Jones v. United States, supra,* 362 U. S., in 1960, Maryland considered the question of standing in approximately 14 opinions. Our law not only required a defendant to have a proprietary or possessory interest in the things seized or the place searched but squarely placed the burden upon the defendant of establishing his standing. *Baum v. State,* 163 Md. 153, 157-158, 161 A. 244 (1932); *Frankel v. State,* 178 Md. 553, 562, 16 A. 2d 93 (1940) (". . . there being no showing nor contention that any of them were the lawful occupants of those premises"); *Leon v. State,* 180 Md. 279, 286, 23 A. 2d 706 (1942); *Bevans v. State,* 180 Md. 443, 448, 24 A. 2d 792 (1942); *Resnick v. State,* 183 Md. 15, 18, 36 A. 2d 347 (1944) ("Where there is no showing nor contention that the persons complaining were the lawful occupants of the premises, they cannot invoke the constitutional provisions against unwarranted search and seizure."); *Kapler v. State,* 194 Md. 580, 586, 71 A. 2d 860 (1950); *Lambert v. State,* 196 Md. 57, 63-64, 75 A. 2d 327 (1950); *Delnegro v. State,* 198 Md. 80, 86,

---

**3.** It is axiomatic that the Fourth Amendment does not extend its protective cloak over a thief in the enjoyment of a stolen automobile, *Palmer v. State, supra,* nor over an unauthorized user in the enjoyment of a temporarily misappropriated automobile, *Shope v. State,* 18 Md. App. 472, 307 A. 2d 730. See also *Kaufman v. United States,* 323 F. Supp. 623 (E.D. Missouri 1971); *Williams v. United States,* 323 F. 2d 90 (10th Cir. 1963); *State v. Pokini,* 367 P. 2d 499 (Hawaii 1961); *Slyte v. State,* 149 So. 2d 489 (Mississippi 1963); *Harper v. State,* 440 P. 2d 893 (Nevada 1968); *State v. Edmonds,* 462 S.W.2d 782 (Missouri 1971); *Meade v. Cox,* 310 F. Supp. 233 (W.D. Virginia 1970). But see *Cotton v. United States,* 371 F. 2d 385 (9th Cir. 1967). Even more compelling than the precedents is the inherent logic of the proposition. No valuable purpose could conceivably be served by extending the protection of the Fourth Amendment to those who have wrongfully appropriated premises or vehicles.

81 A. 2d 241 (1951); *Curreri v. State,* 199 Md. 54, 56, 85 A. 2d 454 (1951) ("Since the appellant claimed no interest in the truck, he could not object to its search."); *Lingner v. State,* 199 Md. 503, 506, 86 A. 2d 888 (1952); *Cross v. State,* 199 Md. 507, 509-510, 86 A. 2d 891 (1952); *Saunders v. State,* 199 Md. 568, 573, 87 A. 2d 618 (1952); *Rizzo v. State,* 201 Md. 206, 209, 93 A. 2d 280 (1952) ("There is no evidence — and no allegation other than any implication in mention of 'the premises of your defendant' in the unsworn petitions for return of property seized — that defendants Rizzo and Nicholson had any interest in the premises."); *Manger v. State,* 214 Md. 71, 75, 133 A. 2d 78 (1957).

In several significant regards, *Cecil Jones* changed the law on standing.[4] For certain possessory crimes and under certain circumstances it conferred "automatic standing" (to be discussed more fully hereinafter). This involved primarily standing in the things seized. *Cecil Jones* also significantly liberalized the law with respect to standing in the place searched. The law, pre-*Jones,* had austerely limited the class of persons who had enough interest in the place searched to raise a constitutional objection to those who could prove a proprietary interest in the place. The liberalization of *Cecil Jones* was to create the notion of "derivative standing" and to extend the Fourth Amendment protection to "anyone legitimately on premises where a search occurs."[5] This

---

**4.** At least it did so as of the time when it became clearly binding on the states through *Mapp v. Ohio,* 367 U. S. 643, 81 S. Ct. 1684, 6 L.Ed.2d 1081 (1961), and *Ker v. California,* 374 U. S. 23, 83 S. Ct. 1623, 10 L.Ed.2d 726 (1963).

**5.** Justice Frankfurter wrote for a unanimous court (with respect to this part of the opinion) in *Cecil Jones,* at 362 U. S. 267:

"No just interest of the Government in the effective and rigorous enforcement of the criminal law will be hampered by recognizing that anyone legitimately on premises where a search occurs may challenge its legality by way of a motion to suppress, when its fruits are proposed to be used against him."

He then underscored the measured use of the adverb "legitimately" by stating the converse:

"This would of course not avail those who, by virtue of their wrongful presence, cannot invoke the privacy of the premises searched."

And see *Walters v. State, supra,* at 8 Md. App. 591.

broadening of the class of those who had standing, however, did not in any way work to shift the burden of proving membership in the protected class. Though the class of "persons aggrieved" was broadened, it was still incumbent upon a defendant to establish that he was a "person aggrieved" by the allegedly unconstitutional search and seizure. This allocation of the burden on the question of standing is simply a particular instance of the general truth that he who pleads and asserts the affirmative of an issue has the burden of proving that issue and fails at his peril. It is a defendant who moves to suppress evidence and must give the court some basis for granting the motion. *Cecil Jones* was very explicit in this regard, at 362 U. S. 261:

> "In order to qualify as a 'person aggrieved by an unlawful search and seizure' one must have been a victim of a search or seizure, one against whom the search was directed, as distinguished from one who claims prejudice only through the use of evidence gathered as a consequence of a search or seizure directed at someone else. Rule 41(e) applies the general principle that a party will not be heard to claim a constitutional protection unless he 'belongs to the class for whose sake the constitutional protection is given.' . . .
>
> Ordinarily, then, *it is entirely proper to require of one who seeks to challenge the legality of a search* as the basis for suppressing relevant evidence *that he allege, and if the allegation be disputed that he establish,* that he himself was the victim of an invasion of privacy." (Emphasis supplied)

This allocation to the defendant of the burden of proving the thing he asserts as the basis for the relief sought was applied by the Supreme Court at least as early as in *Nardone v. United States,* 308 U. S. 338, 341, 60 S. Ct. 266, 268, 84 L. Ed. 307 (1939):

> "The burden is, of course, on the accused in the first

instance to prove to the trial court's satisfaction that wire-tapping was unlawfully employed."

The allocation of the burden as set forth in *Cecil Jones* was reaffirmed by the Supreme Court in *Mancusi v. DeForte*, 392 U. S. 364, 88 S. Ct. 2120, 20 L.Ed.2d 1154 (1968); *Simmons v. United States*, 390 U. S. 377, 88 S. Ct. 967, 19 L.Ed.2d 1247 (1968); and *Alderman v. United States, supra. Alderman* said, at 394 U. S. 173-174:

> "The rule is stated in *Jones v. United States*, 362 U. S. 257, 261, 4 L.Ed.2d 697, 702, 80 S. Ct. 725, 78 A.L.R.2d 233 (1960):
>
> . . . [citing the two paragraphs from *Cecil Jones* quoted above]. . .
>
> This same principle was twice acknowledged last Term. *Mancusi v. DeForte*, 392 U. S. 364, 20 L.Ed.2d 1154, 88 S. Ct. 2120 (1968); *Simmons v. United States*, 390 U. S. 377, 19 L.Ed.2d 1247, 88 S. Ct. 967 (1968).
>
> We adhere to these cases and to the general rule that Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted."

In discussing the impact of *Cecil Jones*, McCormick, *Law of Evidence* (2nd Edition 1972), § 179, "Enforcement of the Right to Exclusion: (a) Standing to Object," p. 419, is very clear:

> "In *Jones v. United States* the Supreme Court made clear that a defendant may obtain suppression of relevant but improperly obtained evidence only *if he establishes* that he himself was a victim of the improper activity which forms the basis for the challenge to the evidence. Only then does he have 'standing' to challenge the admissibility of the evidence." (Emphasis supplied)

Although the allocation of the burden in Maryland had been more something axiomatically taken for granted than

something consciously decided the allocation was more deliberately expressed in *Stewart v. State,* 1 Md. App. 309, 314, 229 A. 2d 727:

"Maryland follows the majority view of the federal and state courts, *requiring the objector to present* to the court *an alleged violation of his own constitutional rights* as a prerequisite to his right to object to 'tainted' evidence." (Emphasis supplied)

Reaffirmed in *Kleinbart v. State,* 2 Md. App. 183, 205 234 A. 2d 288.

The academic commentators are in complete accord. See Abbott *et al., Law and Tactics in Exclusionary Hearings* (1969), at 52:

"In order to successfully invoke the exclusionary rules relevant to illegal searches and seizures the claimant must first establish his 'standing' to object."

and again at 54:

"[T]he burden of proving standing is generally on the defendant at a motion to suppress."

and again at 107-108:

"The burden of going forward with evidence at an exclusionary hearing is clearly upon the defendant. The defendant is the moving party and should be the first to introduce evidence under any rule of orderly procedure. Futhermore, compliance with this requirement alerts the hearing court to the nature and extent of the claimed illegal conduct.

. . . .

If the defense fails to sustain its burden of going forward, the court may deny the motion."

and again at 110:

"The burden of persuasion 'remains throughout upon the one who at the outset has asserted the affirmative of the issue.' At an exclusionary

hearing the defense has asserted the affirmative because it has requested the court to suppress certain evidence. Thus, unless the government has been specially assigned the burden under a particular exclusionary rule [as in the case of a confession], the defense has the obligation to persuade the hearing judge at the conclusion of all the evidence that the facts are such as to require a granting of the motion.

When the burden of persuasion is imposed on the defense, the standard of proof usually required by the court is a 'preponderance of the evidence'."

And see White and Greenspan, *Standing to Object to Search and Seizure*, 118 U. of Pa.L.Rev. 333 (1970): "[T]he Court has traditionally held that a defendant who wishes to have evidence excluded must first establish standing to object to the unlawful search," p. 333; Grove, *Suppression of Illegally Obtained Evidence: The Standing Requirement on its Last Leg*, 18 Catholic U.L.Rev. 150 (1968): "A claimant must establish specific standing in order to invoke exclusionary rules relevant to illegal searches and seizures," p. 153, "Where the claimant can show he is such person, he has established a logical nexus between his status and the alleged illegality of the search and seizure . . . The defendant has the burden of proving standing on a motion to suppress," p. 155; Weeks, *Standing to Object in the Field of Search and Seizure*, 6 Ariz.L.Rev. 65 (1964): "The rule is generally stated that before a person is entitled to object to the admission of illegally seized evidence *he must claim and show* a possessory or proprietary interest in either the property seized or the premises searched," (emphasis supplied), p. 65; Comment, *Standing to Contest Illegal Searches and Seizures*, 46 Mississippi L.J. 147 (1975): "Relying solely on the illegality of the search or seizure, however, is not enough; *the movant must also establish* that he is the proper party to raise the claim of illegality," (emphasis supplied), p. 147, "In its search and seizure context, *the doctrine* [of standing] *requires a defendant to establish* that he has suffered personal, financial, or some

other direct injury from the illegal conduct. A defendant will not be allowed to complain that another's rights have been violated; fourth amendment rights are personal and cannot be asserted vicariously," (emphasis supplied), p. 148.

And see *People v. Berrios*, 28 N.Y.2d 361, 367, 321 N.Y.S.2d 884, 888 (1971), wherein the New York Court of Appeals held:

> "[W]e have made it clear that where a defendant challenges the admissibility of physical evidence or makes a motion to suppress, he bears the ultimate burden of proving that the evidence should not be used against him. . . ."

It is clear beyond peradventure of a doubt that the burden of asserting and establishing standing was upon the appellants. Since the burden was theirs they lose the nothing-nothing ties. The motions to suppress the physical evidence were properly denied.

### The Possible Utility of "Automatic Standing"

There remains but to consider the possibility that the "automatic standing" notion of *Cecil Jones* might somehow apply to the appellants here. We hold that it does not, primarily because of our considered belief that the very concept of "automatic standing" has been superseded and rendered a dead letter by *Simmons v. United States*, 390 U. S. 377, 88 S. Ct. 967, 19 L.Ed.2d 1247 (1968).

To understand what happened to this aspect of *Cecil Jones*, we must understand what gave rise to this aspect of *Cecil Jones*. The harsh dilemma that generated the need for "automatic standing" in the first instance was the pre-*Jones* practice of making a defendant, charged with the crime of possession, assert an interest in the goods allegedly possessed in order to raise the search and seizure issue and then, upon the merits, to permit the State to prove the crime by offering that very pretrial assertion. The defendant was heist on his own petard.[6] The dilemma was starkly

---

6. As we said in *Palmer v. State, supra*, at 14 Md. App. 162-163:

"Where a defendant, in order to assert sufficient standing to

delineated by Judge Learned Hand in *Connolly v. Medalie*, 58 F. 2d 629 (2d Cir. 1932), at 630:

> "Men may wince at admitting that they were the owners, or in possession, of contraband property; may wish at once to secure the remedies of a possessor, and avoid the perils of the part; but equivocation will not serve. If they come as victims, they must take on that role, with enough detail to cast them without question. The petitioners at bar shrank from that predicament; but they were obliged to choose one horn of the dilemma."

It was the office of "automatic standing" to remove a defendant from the horns of Learned Hand's dilemma. *Cecil Jones* pointed out that the government, as well as the defendant, was faced with a choice of contradictory positions and was engaging, in Frankfurter's words, in "elegantia juris," in seeking to avoid its unpalatable choice by deferring to the defendant and making him choose first. It pointed out the fundamental unfairness of permitting "the government to have the advantage of contradictory positions as a basis for conviction," 362 U. S. at 263. The cruel predicament which "automatic standing" was devised to avoid was summarized by *Cecil Jones*, at 362 U. S. 261-262:

> "[P]rosecutions like this one have presented a special problem. To establish 'standing,' Courts of Appeals have generally required that the movant claim either to have owned or possessed the seized property or to have had a substantial possessory interest in the premises searched. Since narcotics charges like those in the present indictment may be established through proof solely of possession of narcotics, a defendant seeking to comply with what

---

challenge the admissibility of evidence, had to claim and to prove a proprietary interest in the very contraband the possession of which was the gravamen of the offense charged, and such damaging admissions could then be used by the prosecutor at the trial on the merits to establish the incriminating nexus between the defendant and the contraband, the defendant was faced with an intolerable 'Hobson's Choice.' "

has been the conventional standing requirement has been forced to allege facts the proof of which would tend, if indeed not be sufficient, to convict him. At the least, such a defendant has been placed in the criminally tendentious position of explaining his possession of the premises. He had been faced . . . with the chance that the allegations made on the motion to suppress may be used against him at the trial. . . ."

The unique problem which "automatic standing" was devised to avoid has now been solved far more efficaciously and more broadly by *Simmons v. United States, supra.* *Simmons,* in a nutshell, holds that any assertion made by a defendant to maintain his position in a pretrial hearing may not later be used against him at the trial upon the merits. The defendant is lifted from the horns of Learned Hand's dilemma. He is no longer forced to assert his interest in the thing seized or the place searched at the risk that his assertion will return to haunt him as part of the State's case in chief. The holding of *Simmons* is briefly stated at 390 U. S. 394:

"[I]n this case Garrett was obliged either to give up what he believed, with advice of counsel, to be a valid Fourth Amendment claim or, in legal effect, to waive his Fifth Amendment privilege against self-incrimination. In these circumstances, we find it intolerable that one constitutional right should have to be surrendered in order to assert another. We therefore hold that when a defendant testifies in support of a motion to suppress evidence on Fourth Amendment grounds, his testimony may not thereafter be admitted against him at trial on the issue of guilt unless he makes no objection."

Strong dicta [7] in *Brown v. United States, supra,* suggests

---

7. Because the crime charged in *Brown* was not possession as such, it was not necessary to face squarely the overruling *vel non* of the "automatic standing" aspect of *Cecil Jones.* The Court said, at 411 U. S. 228:

"But it is not necessary for us now to determine whether our

that the "automatic standing" aspect of *Cecil Jones* has been superseded by *Simmons*. The Supreme Court said in *Brown*, at 411 U. S. 228:

> "The self-incrimination dilemma, so central to the *Jones* decision, can no longer occur under the prevailing interpretation of the Constitution. Subsequent to *Jones*, in *Simmons v. United States*, *supra*, we held that a prosecutor may not use against a defendant at trial any testimony given by that defendant at a pretrial hearing to establish standing to move to suppress evidence. . . . For example, under the *Simmons* doctrine the defendant is permitted to establish the requisite standing by claiming 'possession' of incriminating evidence. If he is granted standing on the basis of such evidence, he may then nonetheless press for its exclusion; but, whether he succeeds or fails to suppress the evidence, his testimony on that score is not directly admissible against him in the trial. Thus, petitioners in this case could have asserted, at the pretrial suppression hearing, a possessory interest in the goods at Knuckles' store without any danger of incriminating themselves. They did not do so."

*Brown* went on, at 411 U. S. 229:

> "Again, we do not decide that this vice of prosecutorial self-contradiction warrants the continued survival of *Jones'* 'automatic' standing now that our decision in *Simmons* has removed the danger of coerced self-incrimination. We simply see no reason to afford such 'automatic' standing where, as here, there was no risk to a defendant either of self-incrimination or prosecutorial self-contradiction. Petitioners were afforded a full

---

decision in *Simmons, supra,* makes *Jones'* 'automatic' standing unnecessary. We reserve that question for a case where possession at the time of the contested search and seizure is 'an essential element of the offense . . . charged.'"

hearing on standing and failed to allege any legitimate interest of any kind in the premises searched or the merchandise seized."

This Court, indeed, anticipated *Brown* in *Palmer v. State, supra,* at 14 Md. App. 167-168, n. 12:

"The *Simmons* decision probably renders the first of the alternative holdings of *Jones* on the question of 'automatic standing' superfluous. It permits a defendant to raise a Fourth Amendment claim and to testify with respect to that claim with absolute immunity from any later use by the prosecutor at the trial upon the merits of his testimony or of his assertion. Since the defendant is no longer faced with the intolerable choice of asserting his Fourth Amendment claim only at the risk of waiving his Fifth Amendment privilege against self-incrimination, the dilemma has been removed which was the sole predicate for the first holding of *Jones.*"

To be sure, *Simmons* leaves open the possibility that a pretrial assertion on standing might yet be used for impeachment purposes if a defendant should affirmatively swear under oath to two contradictory positions. As with the *Viven Harris v. New York,* 401 U. S. 222, 91 S. Ct. 643, 28 L.Ed.2d 1 (1971), limitation upon *Miranda v. Arizona,* 384 U. S. 436, 86 S. Ct. 1602, 16 L.Ed.2d 694 (1966), however, the Supreme Court does not equate a salutary protection of constitutional right with a license for perjury. In terms of chilling effect, the insubstantiality of this residual deterrent on a defendant was well articulated by McCormick, *Law of Evidence* (2d Edition 1972), § 179, "Enforcement of the Right to Exclusion: (a) Standing to Object," p. 421:

"Given the Supreme Court's subsequent holding that testimony on a hearing at a motion to suppress is not admissible at the trial on the merits, the dilemma posed by all the automatic standing cases is much less aggravated than it was formerly. Except insofar as it removes the incentive for a

defendant to perjure himself, the automatic standing rule is now unnecessary. A defendant's interest in being able to assert inconsistent positions is significantly different from his interest in being able to assert his right to the exclusion of illegally seized evidence without fear of jeopardizing his right to put the prosecution to its proof on the issue of guilt. The former seems insufficient to support an exception to an otherwise justifiable rule."

*Simmons* is a more sophisticated and carefully tailored second-generation remedy, replacing the cruder first-generation effort of *Cecil Jones* to deal with the same problem. "Automatic standing" was a blunt and inadequate instrument in several regards. At times it did too much; at times it did not do enough. *Cecil Jones*, by its very terms, applied "automatic standing" only to those crimes where present possession was an element of the crime itself — where the assertion of standing, if later used by the State in chief, did not simply contribute to a finding of guilt but was itself sufficient to establish guilt. The academic commentators [8] have pointed out that four separate categories of seized goods may be involved and that each calls for separate analysis in terms of the applicability of *Jones'* "automatic standing": (1) contraband per se (squarely within the holding of *Jones*); (2) derivative contraband (such as the stolen goods where the charge is receiving stolen goods — logically also within the holding of *Jones*. See *Anderson v. State*, 9 Md. App. 532, 267 A. 2d 296 (1970)); (3) fruits of a theft (such as stolen goods but where the charge is larceny, burglary, robbery, etc. whereof the possession of the stolen goods is simply evidence and not an element of the crime itself — probably not covered by *Cecil Jones* as witness the robbery charge in *Simmons* — and as applicable

---

**8.** Grove, *Suppression of Illegally Obtained Evidence: The Standing Requirement on Its Last Leg*, 18 Catholic U.L.Rev. 150 (1968); White and Greenspan, *Standing to Object to Search and Seizure*, 118 U. of Pa.L.Rev. 333 (1970); Abbott, *et al, Law and Tactics in Exclusionary Hearings* (1969), at 58-63. And see *Palmer v. State, supra,* 14 Md. App. at 164-165, n. 10.

to the appellant Smith in the case now before us); and (4) mere evidentiary items (not covered by *Jones* by the vast weight of authority). This possible inadequacy of "automatic standing" was pointed out by *Simmons*, at 390 U. S. 391-392:

> "The dilemma faced by defendants like Garrett is most extreme in prosecutions for possessory crimes, for then the testimony required for standing itself proves an element of the offense. We eliminated that Hobson's choice in *Jones v. United States, supra*, by relaxing the standing requirements. This Court has never considered squarely the question whether defendants charged with nonpossessory crimes, like Garrett, are entitled to be relieved of their dilemma entirely."

*Simmons* thus afforded a broader Fourth Amendment protection in those instances where "automatic standing" in the things seized did not go far enough.

On the other hand, "automatic standing" in the place searched ran the distinct danger of going too far. *Cecil Jones*, given the proper possessory crime, appeared to make no distinction between standing in the things seized and standing in the place searched. Yet the distinction might often be called for. An acknowledgement of a possessory interest in the things seized — be it contraband or derivative contraband — would be tantamount to a confession of guilt in a crime of possession; an acknowledgement, on the other hand, of a possessory interest or of derivative standing in the place searched would not be tantamount to a confession of guilt, even though it might be some evidence of guilt. In terms of contradictory positions being taken by the State, the two classes of interest are analytically severable. The State may not with good grace deny, on the standing issue, the very possession which it has alleged and will seek to prove. The State's denial of a defendant's possessory or derivative interest in the place searched, however, is not contradictory to the State's trial position. The State may prove its case as well by showing that a defendant "stashed"

his contraband in a burglarized premises or a stolen car as by showing that he kept it in a place wherein he had a legitimate interest or was legitimately on the premises.

With respect to possession of the things seized, "automatic standing" simply permits the candid assertion of a true position without risk of being later incriminated by that candor. With respect to an interest in the place searched, on the other hand, "automatic standing" could lead to the conclusive presumption of palpable untruths. Given a charge of possession of contraband, should "automatic standing" be extended to a burglar in a burglarized premises or to a thief in a stolen car? Where a defendant clearly has no interest in the place searched, may "automatic standing" conclusively presume that he was "legitimately on the premises" during the search when he was demonstrably elsewhere (just as the defendants in *Brown v. United States, supra,* were in jail in Ohio when the search took place in Kentucky)? A logical extension of *Cecil Jones'* "automatic standing" in the place searched could lead to such manifest absurdities. This would be a socially intolerable instance of a Fourth Amendment doctrine run amok. *Simmons,* as a replacement for "automatic standing," precludes such unacceptable positions being foisted upon the courts and contains the establishment of standing to the establishment of truth.

Between 1960 and 1968, "automatic standing" served a necessary purpose but at some cost. Since *Simmons,* the reason of necessity which gave rise to "automatic standing" no longer exists. It is not simply redundant but would now cause us to pay its costs unnecessarily. The reason for the law has ceased to exist and it should not be followed simply as a conditioned reflex. Although dealing with a time lag far greater than that between the birth of *Simmons* and the formal obituary of *Cecil Jones,* the words of Oliver Wendell Holmes are nonetheless pertinent:

> "It is revolting to have no better reason for a rule of law than that so it was laid down in the time of Henry IV. It is still more revolting if the grounds upon which it was laid down have vanished long

since, and the rule simply persists from blind imitation of the past." [9]

*Cessante ratione legis, cessat et ipsa lex.*[10] So let it be with "automatic standing."

## The Alleged Miranda Violations

It is unnecessary even to consider on the merits the *Miranda* issues raised by the appellants. The admissions which they challenge were only those made to the arresting officers at the time of the arrests to the effect that the appellants did not own and had no interest in the white Mercury. Since, as we have held above, the burden was not upon the State to prove non-standing, admissions which were used in this regard went only to an immaterial issue. They are, therefore, harmless by definition.

## Legal Sufficiency of the Evidence

In slightly varied forms, the two appellants challenge the legal sufficiency of the evidence. There is no merit in their claims. The stolen goods from Montgomery Ward's were found in the trunk of the automobile with which they were linked by witnesses. There were, moreover, proximities of time and place between them and the larceny. There were also the observations of the security personnel at J. C. Penney's which established that on the afternoon in question, the two appellants were acting in concert.

*Judgments affirmed.*

---

**9.** *The Path of the Law,* 10 Harv.L.Rev. 457, 469 (1897).

**10.** When the reason for a law ceases, the law ceases.